LANVALE PROPS., LLC v. CNTY. OF CABARRUS

[366 N.C. 142 (2012)]

LANVALE PROPERTIES, LLC AND CABARRUS COUNTY BUILDING INDUSTRY
ASSOCIATION v. COUNTY OF CABARRUS AND CITY OF LOCUST

No. 438PA10

(Filed 24 August 2012)

**1. Counties— enactment of ordinance—new residential construction—school construction fee—presumption of validity rebutted—no statutory authority**

The trial court did not err in an action concerning defendant county's authority to enact an ordinance that conditioned approval of new residential construction projects on developers paying a fee to subsidize new school construction by granting summary judgment in favor of plaintiff developer. Plaintiff rebutted the ordinance's presumption of validity and the plain language of N.C.G.S. §§ 153A-340(a) and -341 did not give the county authority to enact the ordinance.

**2. Counties— enactment of ordinance—new residential construction—school construction fee—no authority pursuant to session law—issue of enforcement not reached**

The trial court did not err in an action concerning defendant county's authority to enact an ordinance that conditioned approval of new residential construction projects on developers paying a fee to subsidize new school construction by granting summary judgment in favor of plaintiff developer. Session Law 2004-39 did not authorize the county to enact its ordinance. The issue of whether the session law authorized the county to enforce the ordinance was not reached.

**3. Counties— enactment of ordinance—new residential construction—school construction fee—not zoning ordinance —not barred by statute of limitations**

The trial court did not err in an action concerning defendant county's authority to enact an ordinance that conditioned approval of new residential construction projects on developers paying a fee to subsidize new school construction by granting summary judgment in favor of plaintiff developer. Because the ordinance at issue was not a zoning ordinance, plaintiff's claims were not barred by the two-month statute of limitations provided in N.C.G.S. §§ 153A-348 and 1-54.1.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous, unpublished decision of the Court of Appeals, 206 N.C. App. 761, 699 S.E.2d 139 (2010), affirming orders entered on 19 August 2008 by Judge Mark E. Klass and on 17 August 2009 by Judge W. David Lee, both in Superior Court, Cabarrus County. Heard in the Supreme Court on 17 October 2011.

> *Ferguson, Scarbrough, Hayes, Hawkins & DeMay, P.A., by James R. DeMay and James E. Scarbrough, for plaintiff-appellee Lanvale Properties, LLC.*

> *Brough Law Firm, by G. Nicholas Herman and Richard M. Koch, for defendant-appellant County of Cabarrus.*

> *Hartsell & Williams, P.A., by Christy E. Wilhelm and Fletcher L. Hartsell, Jr., for defendant-appellee City of Locust.*

> *J. Michael Carpenter, General Counsel, and Burns, Day & Presnell, P.A., by Daniel C. Higgins and James J. Mills, for North Carolina Home Builders Association, amicus curiae.*

JACKSON, Justice.

In this appeal we consider whether defendant Cabarrus County ("the County") had the authority pursuant to its general zoning powers or, in the alternative, a 2004 law enacted by the General Assembly, to adopt an adequate public facilities ordinance ("APFO") that effectively conditions approval of new residential construction projects on developers paying a fee to subsidize new school construction to prevent overcrowding in the County's public schools. Because we hold that the County lacked this authority, we affirm the Court of Appeals.

I

Concerned about the effect of explosive population growth on the County's ability to provide adequate public facilities for its citizens, the Cabarrus County Board of Commissioners ("the Board") adopted an initial APFO in January 1998. In that form the APFO, which was enacted as an amendment to the County's subdivision ordinance, conditioned County approval of new residential developments on the existence of sufficient public facilities to support the developments. In concise language the ordinance stated: "To ensure public health, safety and welfare the [Cabarrus County] Planning and Zoning Commission shall review each subdivision, multi-family development, and mobile home park to determine if public facilities

are adequate to serve that development." Cabarrus County, N.C., Subdivision Ordinance ch. 4. § 17 (Jan. 1998). Pursuant to the ordinance, the County's Planning and Zoning Commission ("the Commission") reviewed all proposed residential developments, except those located within the territorial jurisdictions of Concord and Kannapolis,[1] to determine if the new homes would exacerbate overcrowding in the County's two public schools systems: the Cabarrus County Schools and Kannapolis City Schools.

The APFO first was applied when Westbrook Highland Creek, LLC ("Westbrook") sought preliminary approval from the Commission for a single family development of approximately 800 units located in an unincorporated area of the County. The Commission denied Westbrook's application based upon insufficient public school capacity. Westbrook appealed to the Board, which ultimately approved the development after Westbrook agreed to place $400,000.00—$500.00 per unit—into an escrow account for the purchase of property for a new high school.

Over the next five years, the Commission denied preliminary approval applications for a number of proposed developments based upon insufficient public school capacity. However, as with the Westbrook development, the Board ultimately approved these developments on appeal once developers executed consent agreements designed to mitigate the impact of their developments on public school capacity. Developers typically agreed to pay an adequate public facilities fee of $500.00 per residential unit; however, some developers agreed to make an in-kind donation of land for future school sites or construct improvements to existing school facilities.

Following the APFO's enactment, county staff began monitoring the number of new residential developments being built in Concord and Kannapolis because these municipalities were not cooperating fully with the County in enforcing the APFO. In some instances, these cities voluntarily annexed residential developments, which precluded the County from collecting adequate public facilities fees. Jonathan Marshall, Director of the Commerce Department of Cabarrus County,

---

1. The Cabarrus County towns of Harrisburg, Midland, and Mt. Pleasant have authorized the County to enforce its zoning and subdivision ordinances within their territorial jurisdictions pursuant to section 160A-360(d) of the North Carolina General Statutes. See N.C.G.S. § 160A-360(d) (2011). The County, which furnishes planning services to these three municipalities, enforced its APFO in those towns at their request. The record indicates that to date, the cities of Concord, Kannapolis, and Locust have not granted this authority to the County.

stated in his affidavit in support of the County's motion for summary judgment that this practice frustrated the Board because approximately seventy percent of new residential developments in the County were located within municipal jurisdictions.

In part to address these frustrations, the Board adopted a resolution on 25 August 2003 expressing its desire that all Cabarrus County municipalities should cooperate with the County in enforcing the APFO. Cabarrus County, N.C., Res. No. 2003-26 (Aug. 25, 2003). The resolution also increased the minimum value of the adequate public facilities fee from $500.00 per residential unit to not less than $1,008.00 per unit. *Id.* Further, the resolution defined the term "school adequacy" to mean "estimated enrollment not exceeding 110% of capacity as determined by the Kannapolis and Cabarrus School Systems." *Id.*

On 30 June 2004, the General Assembly enacted Chapter 39 of the 2004 North Carolina Session Laws ("Session Law 2004-39" or "the session law"), which authorized the annexation of several properties in Cabarrus County. Section 5 of the session law attempted to clarify the authority of municipalities to enforce the APFO. Act of June 30, 2004, ch. 39, sec. 5, 2004 N.C. Sess. Laws 42, 47. About a month and a half later, during its 16 August 2004 meeting, the Board adopted a resolution linking the APFO to the session law. *See* Cabarrus County, N.C., Res. No. 2004-30 (Aug. 16, 2004).

Over the next few months, the Board made several more revisions to the APFO. On 20 September 2004, the Board adopted a resolution that increased the value of the adequate public facilities fee from not less than $1,008.00 per residential unit to not less than $4,034.00 per single family unit and $1,331.00 per multifamily unit. Cabarrus County, N.C., Res. No. 2004-37 (Sept. 20, 2004). The resolution also indexed the fee to reflect annual changes in the cost of public school construction. *Id.* During the Board's discussion concerning the resolution, several Board members stated that developers should be required to pay for the cost of constructing new public schools in the County. The sentiment among most commissioners was "whoever creates the problems pays the bills." One commissioner expressed the view that "[t]he people using [subdivision developments] should pay for the school[,] not 93 year-olds. If [developers] are going to build $150-$300 thousand dollar house [sic] they should pay for the schools." The Board's vice chair voted against the resolution, citing concerns about "the legality of the [APFO's] advancement requirement" and the potential for litigation.

In August 2005 the Board began considering the possibility of making further changes to the APFO. Almost two years later, on 20 August 2007, the Board adopted the APFO in its current form. Cabarrus County, N.C., Zoning Ordinance No. 2007-11 (Aug. 20, 2007). Notably, the revised APFO was added as a new chapter to the County's zoning ordinance. *Id.* As a result, the revised APFO superseded the version that appeared in the County's subdivision ordinance. The Board also attempted to tie the new version of the APFO to the session law, stating that "Per Session Law 2004-39, H.B. 224, Cabarrus County may review proposed developments within an incorporated area of the County for compliance with the Level of Service standards for schools." Cabarrus County, N.C., Zoning Ordinance ch. 15, § 9(1)(b) (Aug. 20, 2007). Less than a month later, the Board amended its subdivision ordinance by inserting a cross-reference to the newly revised APFO. Cabarrus County, N.C., Subdivision Ordinance No. 2007-12 (Sept. 17, 2007).

The current APFO is more sophisticated than the earlier version. Covering over twenty pages, the ordinance goes into great detail about the process for review of the County's school capacity. The current APFO includes thirty-four definitions, *see* Zoning Ordinance ch. 15, § 3, illustrates the ordinance's Reservation of Capacity Process with a flow chart, *id.* ch. 15, § 8, and describes the complex statistical formula used to calculate the estimated enrollment impact of a proposed development, *id.* ch. 15, §§ 9-11. In contrast, the prior version occupied only two paragraphs in the County's subdivision ordinance. *See* Cabarrus County, N.C., Subdivision Ordinance, ch 4. § 17 (June 24, 2004).

Notwithstanding its complexity, the current APFO operates in much the same manner as the prior version; that is, it links residential development approval to the availability of space for students in the County's public school systems.[2] Pursuant to the ordinance, proposed residential developments, except those located in Concord, Kannapolis, and Locust, are reviewed to determine whether local elementary, middle, and high schools have sufficient student capacity to support the development. Zoning Ordinance ch. 15, § 7.

---

2. All residential developments, including single family units, townhouses, multi-family units (e.g., apartments), and mobile home parks, that impact public school capacity are subject to the APFO. Zoning Ordinance ch. 15, § 4(1). However, residential developments which are unlikely to impact public school enrollment, such as retirement homes and subdivisions of five lots or less, do not fall within its jurisdiction. *Id.*

If there is sufficient unused student capacity to support a proposed development, the Board is *required* to approve the development without additional APFO conditions. *Id.* ch. 15, § 7(1). But if available student capacity is insufficient to support the development, the Board may either deny the developer's application or approve it subject to several "conditions that reduce or mitigate the impacts of the proposed development." *Id.* ch. 15, § 7(2)-(3). These conditions include: (1) deferring approval of final plats, building permits, or certificates of occupancy for a maximum of five years or until sufficient student capacity becomes available; (2) phasing construction of the development in increments that coincide with available capacity; (3) reducing density or intensity of the development; (4) entering into a consent agreement involving a monetary contribution, the donation of land, or construction of a school; or (5) "any other reasonable conditions to ensure that all [public schools] will be adequate and available." *Id.* ch. 15, §§ 7, 8.

When a developer enters into a consent agreement with the County, the developer receives a Reservation of Capacity Certificate that requires the developer to secure proof of development approval from any other local jurisdiction within one year of issuance. *Id.* ch. 15 §§ 6-8. Once the developer submits proof of approval to the Board, the consent agreement is approved, executed, and recorded. *Id.* ch. 15, §§ 6(6)(d), 8. At this point the developer may proceed to review of construction drawings, permitting, and ultimately, construction. *Id.* ch. 15., § 8.

The ordinance's reference to a monetary contribution continued the practice of developers paying an adequate public facilities fee to secure Board approval of their projects. Pursuant to the current version of the APFO, these fees are dedicated to the construction of public schools in the specific areas that are impacted by particular developments. Eventually, these fees became known as voluntary mitigation payments ("VMPs"). In 2008 the Board increased the VMP from not less than $4,034.00 per single family unit and $1,331.00 per multifamily unit to $8,617.00 per single family unit, $4,571.00 per townhouse, and $4,153.00 per multifamily unit. Between 2003 and 2008, the Board increased the APFO's fee for single family units by more than 1,600 percent. As a result of these fees, the APFO has provided the County a substantial source of alternative funding for public schools. Since enactment of the APFO, the County has spent or budgeted over $267 million for school construction.

II

Plaintiff Lanvale Properties, LLC plans to construct a residential development on fifty-four acres located within the territorial jurisdiction of the City of Locust ("Locust"). Most of the site is in Cabarrus County; however, a small portion is in Stanly County. Plaintiff alleges that Cabarrus County has refused to issue a building permit for its development until it complies with the APFO.

On 4 April 2008, plaintiff filed a declaratory judgment action[3] against Cabarrus County and Locust[4] challenging the validity of the County's APFO on various statutory and constitutional grounds.[5] The County answered plaintiff's first amended complaint on 8 June 2008,[6] asserting, *inter alia*, that: (1) plaintiff's complaint should be dismissed pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure for failure to state any claim upon which relief can be granted; and (2) plaintiff's claims are barred by the two-month statute of limitations set forth in sections 153A-348 and 1-54.1 of the North Carolina General Statutes. The trial court denied defendant's motions to dismiss on 19 August 2008 and further concluded that the statute of limitations did not bar plaintiff's claims for relief.

On 18 May 2009 and 20 May 2009, plaintiff and the County filed cross-motions for summary judgment regarding all claims in the case. After hearing the motions on 1 June 2009, the trial court allowed

3. In accordance with Rule 40 of the North Carolina Rules of Appellate Procedure, the Court of Appeals consolidated plaintiff's declaratory judgment action with two similar actions filed against Cabarrus County. *See Lanvale Props., LLC v. Cnty. of Cabarrus*, 206 N.C. App. 761, 699 S.E.2d 139, 2010 WL 3467567, at *1 (2010) (unpublished) (consolidating with *Craft Dev., LLC. v. Cnty. of Cabarrus*, No. COA09-1610 (N.C. Ct. App.) and *Mardan IV v. Cnty. of Cabarrus*, No. COA09-1611 (N.C. Ct. App.)). Craft Development, LLC plans to develop a 15.56 acre tract of land located in Midland into a multifamily project. Mardan IV intends to develop a 168 unit apartment complex on an 11.23 acre parcel of land located within the corporate boundaries of Concord. *Id.* at *2.

4. Locust's territorial jurisdiction overlaps the border between Cabarrus and Stanly Counties. On 20 September 2004, the Stanly County Board of Commissioners adopted an APFO that is similar to the Cabarrus County APFO. Notably, Stanly County's minimum VMP is $1,500.00 per residential unit.

5. Plaintiff subsequently amended its complaint on 23 April 2008 and 29 August 2008. In addition, on 19 August 2008, the trial court allowed the Cabarrus County Building Industry Coalition to intervene in this matter as a party plaintiff pursuant to Rule 24 of the North Carolina Rules of Civil Procedure. Because Lanvale is the only plaintiff participating in this appeal, we will refer to plaintiff in the singular throughout this opinion.

6. Locust filed its answers on 27 June 2008 and 26 September 2008.

plaintiff's summary judgment motion and denied the County's motion in an order entered on 17 August 2009. In its written order the trial court concluded as a matter of law that: (1) the County did not have inherent authority to enact its APFO pursuant to North Carolina's general zoning or subdivision statutes; and (2) even if the County had authority to enact the APFO, Session Law 2004-39 did not authorize the County to enforce the APFO within the territorial jurisdictions of Concord, Midland, and Locust. The County appealed.[7]

The Court of Appeals unanimously affirmed the trial court's ruling in an unpublished opinion issued on 7 September 2010. *Lanvale Props., LLC v. Cnty. of Cabarrus*, 206 N.C. App. 761, 699 S.E.2d 139, 2010 WL 3467567 (2010) (unpublished). We allowed the County's petition for discretionary review on 15 June 2011.

## III

Entry of summary judgment by a trial court is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (2011); *see also Blades v. City of Raleigh*, 280 N.C. 531, 544-45, 187 S.E.2d 35, 42-43 (1972). Because the parties do not dispute any material facts, "[w]e review [the] trial court's order for summary judgment de novo to determine . . . whether either party is 'entitled to judgment as a matter of law.' " *Robins v. Town of Hillsborough*, 361 N.C. 193, 196, 639 S.E.2d 421, 423 (2007) (quoting *Summey v. Barker*, 357 N.C. 492, 496, 586 S.E.2d 247, 249 (2003)). When applying de novo review, we "consider[ ] the case anew and may freely substitute" our own ruling for the lower court's decision. *Morris Commc'ns Corp. v. City of Bessemer City Zoning Bd. of Adjust.*, 365 N.C. 152, 156, 712 S.E.2d 868, 871 (2011) (citing *Mann Media, Inc. v. Randolph Cnty. Planning Bd.*, 356 N.C. 1, 13, 565 S.E.2d 9, 17 (2002)).

## IV

The County urges us to reverse the decisions below for three reasons: (1) The County was authorized to adopt the APFO pursuant to its "general zoning power"; (2) Session Law 2004-39 authorized the County to "adopt and enforce its APFO countywide, including within

---

7. Although plaintiff named Locust as a defendant, Locust did not join in the County's appeal. Instead, Locust filed a brief persuasively arguing that the County lacks authority to enact its APFO.

incorporated areas of the county and without the request or consent of any municipality in the County"; and (3) Plaintiff's claims were barred by the applicable statute of limitations. We reject each of these arguments.

V

We first must look to the nature of counties and their role within the structure of State government. This Court clearly has stated that:

> In the exercise of ordinary governmental functions, [counties] are simply agencies of the State constituted for the convenience of local administration in certain portions of the State's territory, and in the exercise of such functions they are subject to almost unlimited legislative control except where this power is restricted by constitutional provision.

*Jones v. Madison Cnty. Comm'rs*, 137 N.C. 579, 596, 50 S.E. 291, 297 (1905). As such, a county's "powers . . . both express and implied, are conferred by statutes, enacted from time to time by the General Assembly." *Martin v. Bd. of Comm'rs of Wake Cnty.*, 208 N.C. 354, 365, 180 S.E. 777, 783 (1935). A county "is not, in a strict legal sense, a municipal corporation, as a city or town. It is rather an instrumentality of the State, by means of which the State performs certain of its governmental functions within its territorial limits." *Id.* With these limitations in mind, we begin our analysis of the County's arguments on appeal.

[1] We first consider the County's argument that its APFO is authorized by sections 153A-340(a) and 153A-341 of the North Carolina General Statutes. At the outset, we note that county zoning ordinances enjoy a presumption of validity. *Orange Cnty. v. Heath*, 278 N.C. 688, 691-92, 180 S.E.2d 810, 812 (1971). As a result, the party challenging the validity of a zoning ordinance must rebut this presumption. *Id.*; *see also Wally v. City of Kannapolis*, 365 N.C. 449, 451, 722 S.E.2d 481, 482 (2012). Similar arguments to those raised by the County have been rejected. *See Amward Homes, Inc. v. Town of Cary*, 206 N.C. App. 38, 53, 698 S.E.2d 404, 416 (2010), *aff'd per curiam without precedential value by an equally divided court*, 365 N.C. 305, 716 S.E.2d 849 (2011); *Union Land Owners Ass'n v. Cnty. of Union*, 201 N.C. App. 374, 380-81, 689 S.E.2d 504, 507-08 (2009), *disc. rev. denied*, 364 N.C. 442, 703 S.E.2d 148 (2010); *see also FC Summers Walk, LLC v. Town of Davidson*, No. 3:09-CV-266-GCM, 2010 WL 4366287, at *3 (W.D.N.C. Oct. 28, 2010) (order remanding case to Superior Court,

Mecklenburg County) (stating that "North Carolina law does appear to be settled" regarding the invalidity of "school APFOs"). After careful consideration, we conclude that plaintiff has rebutted the APFO's presumption of validity, *see Wally*, 365 N.C. at 451, 722 S.E.2d at 482, and that the County lacked statutory authority to enact the ordinance.

We look further at several foundational principles defining the structure of our State government. The Constitution of North Carolina vests the State's legislative power in the General Assembly, N.C. Const. art. II, § 1, and permits the legislature to delegate some of its "powers and duties to counties, cities and towns, and other governmental subdivisions as it may deem advisable," *id.* art. VII, § 1 para. 1; *see also Chrismon v. Guilford Cnty.*, 322 N.C. 611, 617, 370 S.E.2d 579, 583 (1988). As we have noted, counties "are instrumentalities of the State government . . . subject to its legislative control." *Comm'rs of Dare Cnty. v. Comm'rs of Currituck Cnty.*, 95 N.C. 189, 191 (1886). As such, "[c]ounties have no inherent authority to enact zoning ordinances." *Jackson v. Guilford Cnty. Bd. of Adjust.*, 275 N.C. 155, 162, 166 S.E.2d 78, 83 (1969).

In accordance with this constitutional framework, the General Assembly has given counties the general authority to enact ordinances. *See* N.C.G.S. § 153A-121(a) (2011) ("A county may by ordinance define, regulate, prohibit, or abate acts, omissions, or conditions detrimental to the health, safety, or welfare of its citizens and the peace and dignity of the county . . . ."). Counties may, therefore, restrict the use of real property when there is a "reasonable basis to believe that [the restrictions] will promote the general welfare by conserving" property values and promoting the "most appropriate use" of land. *Blades*, 280 N.C. at 546, 187 S.E.2d at 43. Based on these general principles, the General Assembly has authorized counties to enact zoning ordinances. *See* N.C.G.S. § 153A-340(a) (2011). But counties do not possess unlimited zoning authority. As the Court of Appeals has observed, "[T]he General Assembly has enacted the zoning and subdivision regulation statutes for the purposes of delineating the authority of county governments to regulate the development of real estate." *Union Land Owners*, 201 N.C. App. at 378, 689 S.E.2d at 506.

Two statutes in particular establish the boundaries of county zoning power. Section 153A-340(a) of the North Carolina General Statutes provides that county zoning ordinances may:

regulate and restrict the height, number of stories and size of buildings and other structures, the percentage of lots that may be occupied, the size of yards, courts and other open spaces, the density of population, and the location and use of buildings, structures, and land for trade, industry, residence, or other purposes.

N.C.G.S. § 153A-340(a). Section 153A-341 describes the "public purposes" that zoning regulations may address:

Zoning regulations shall be designed to promote the public health, safety, and general welfare. To that end, the regulations may address, among other things, the following public purposes: to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population; to lessen congestion in the streets; to secure safety from fire, panic, and dangers; and to facilitate the efficient and adequate provision of transportation, water, sewerage, schools, parks, and other public requirements. The regulations shall be made with reasonable consideration as to, among other things, the character of the district and its peculiar suitability for particular uses, and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout the county. In addition, the regulations shall be made with reasonable consideration to expansion and development of any cities within the county, so as to provide for their orderly growth and development.

*Id.* § 153A-341 (2011). Thus, county zoning ordinances are valid when they conform to the contours of the authority described in these enabling statutes.

Based on their plain language, sections 153A-340(a) and 153A-341 do not expressly authorize the County's APFO. Consequently, the County contends that these statutes convey implied authority for the ordinance. In support of its position, the County urges us to construe these provisions in light of section 153A-4 of the North Carolina General Statutes, which states:

It is the policy of the General Assembly that the counties of this State should have adequate authority to exercise the powers, rights, duties, functions, privileges, and immunities conferred upon them by law. To this end, the provisions of this Chapter and of local acts shall be broadly construed and grants of power shall be construed to include any powers that are reasonably expedient to the exercise of the power.

*Id.* § 153A-4 (2011). The County argues that the Court of Appeals and the trial court erred by failing to apply section 153A-4. We disagree.

This Court's general approach to construing the legislative authority of local governments has evolved over time. Early in our history, we broadly construed the State's grant of legislative authority to municipalities. *See* David W. Owens, *Local Government Authority to Implement Smart Growth Programs,* 35 Wake Forest L. Rev. 671, 680 n.47, 682 (2000) [hereinafter Owens, *Local Gov't Auth.*] (citing *Whitfield v. Longest,* 28 N.C. (6 Ired.) 268 (1846); *Hellen v. Noe,* 25 N.C. (3 Ired.) 493 (1843); *Shaw v. Kennedy,* 4 N.C. (Taylor) 591 (1817)). However, in the 1870s this Court adopted a more restrictive approach known as "Dillon's Rule." *Smith v. City of Newbern,* 70 N.C. 14, 18 (1874); *see also* David W. Owens, *Land Use Law in North Carolina* 22-23 (2d ed. 2011) [hereinafter Owens, *Land Use Law*]. Dillon's Rule is a rule of statutory construction that is based on the

> general and undisputed proposition of law, that a municipal corporation possesses and can exercise the following powers and no others: First, those granted in *express words;* second, those *necessarily or fairly implied in or incident* to the powers expressly granted; third, those *essential* to the declared objects and purposes of the corporation.

*Smith,* 70 N.C. at 18. Nonetheless, this Court's application of Dillon's Rule did not always constrain local government authority. *See* Owens, *Local Gov't Auth.*, at 680-693 (describing the application of Dillon's Rule in North Carolina from the mid-1860s to 1971). Still, the rule "was applied more stringently to interpretation of grants of authority for taxes and *fees* and local government service provision than to grants of regulatory authority." Owens, *Land Use Law,* at 23 n.17 (emphasis added).

In 1973 the General Assembly enacted section 153-4 (now codified as section 153A-4) of the North Carolina General Statutes two years after it adopted section 160A-4, a similar provision relating to municipal governments. *See* Act of May 24, 1973, ch. 822, sec. 1, 1973 N.C. Sess. Laws 1233, 1234; Act of June 30, 1971, ch. 698, sec. 1, 1971 N.C. Sess. Laws 724, 725. Our initial application of these provisions to zoning cases was inconsistent. In *Porsh Builders, Inc. v. City of Winston-Salem,* one of our first decisions following enactment of these statutes, we did not apply section 160A-4, but rather used Dillon's Rule to analyze whether the city was required by statute to accept "the highest responsible bid" for a parcel of land that it

owned. 302 N.C. 550, 552, 554, 276 S.E.2d 443, 444, 445 (1981) (stating that "it is generally held that statutory delegations of power to municipalities should be strictly construed, resolving any ambiguity against the corporation's authority to exercise the power"). Subsequently, we stated that section 160A-4 established a "legislative mandate that we are to construe in a broad fashion the provisions and grants of power" conferred upon municipalities. *River Birch Assocs. v. City of Raleigh*, 326 N.C. 100, 109, 388 S.E.2d 538, 543 (1990). Thereafter, in *Homebuilders Ass'n of Charlotte, Inc. v. City of Charlotte* we applied section 160A-4 to uphold the city's imposition of user fees in conjunction with the provision of regulatory services and the use of public facilities because the user fees were "reasonably necessary or expedient to the execution of the City's power to regulate the activities for which the services are provided." 336 N.C. 37, 45, 442 S.E.2d 45, 50 (1994).

Relying on *Homebuilders* and *River Birch*, the County argues that the decisions below conflict with our "repeated pronouncements that [section 153A-4's broad construction] mandate must *always* be faithfully applied in interpreting the powers conferred by the Legislature to counties and cities in enacting zoning regulations." (emphasis added). The principal flaw in the County's argument is that section 153A-4 is a rule of statutory construction rather than a general directive to give our general zoning statutes the broadest construction possible. As we long have held, " 'Statutory interpretation properly begins with an examination of the plain words of the statute.' " *Three Guys Real Estate v. Harnett Cnty.*, 345 N.C. 468, 472, 480 S.E.2d 681, 683 (1997) (quoting *Correll v. Div. of Soc. Servs.*, 332 N.C. 141, 144, 418 S.E.2d 232, 235 (1992)). " 'If the language of the statute is clear and is not ambiguous, we must conclude that the legislature intended the statute to be implemented according to the plain meaning of its terms.' " *Id.* (quoting *Hyler v. GTE Prods. Co.*, 333 N.C. 258, 262, 425 S.E.2d 698, 701 (1993)). Thus, " '[w]hen the language of a statute is clear and unambiguous, there is no room for judicial construction, and the courts must give it its plain and definite meaning.' " *Smith Chapel Baptist Church v. City of Durham*, 350 N.C. 805, 811, 517 S.E.2d 874, 878 (1999) (quoting *Lemons v. Old Hickory Council, BSA, Inc.*, 322 N.C. 271, 276, 367 S.E.2d 655, 658 (1988)). Therefore, "a statute clear on its face must be enforced as written." *Bowers v. City of High Point*, 339 N.C. 413, 419-20, 451 S.E.2d 284, 289 (1994) (citing *Peele v. Finch*, 284 N.C. 375, 382, 200 S.E.2d 635, 640 (1973)).

Consequently, section 153A-4 applies only when our zoning statutes are ambiguous, *see Smith Chapel*, 350 N.C. at 811, 517 S.E.2d at 878 (citing *Lemons*, 322 N.C. at 276, 367 S.E.2d at 658), or when its application is necessary to give effect to "any powers that are reasonably expedient to [a county's] exercise of the power," *see* N.C.G.S. § 153A-4.[8] Sections 153A-340(a) and 153A-341 express in unambiguous language the General Assembly's intent to delegate general zoning powers to county governments. Thus, section 153A-4 is inapposite in the instant case.

Accordingly, we must ascertain whether the plain language of our enabling statutes gives the County implied authority to enact its APFO. We hold that it does not. When interpreting a statute we "presume that the legislature acted with care and deliberation, and, when appropriate," we consider "the purpose of the legislation." *Bowers*, 339 N.C. at 419-20, 451 S.E.2d at 289 (citations omitted). As we have noted above, the purpose of sections 153A-340(a) and 153A-341 is to give counties general authority to enact zoning ordinances. Consequently, these provisions articulate basic zoning concepts. In so doing, these statutes impose reasonable constraints on how county governments may exercise their zoning powers. *See Union Land Owners*, 201 N.C. App. at 378, 689 S.E.2d at 506. Although we acknowledge that counties have "considerable latitude" in implementing these powers, we previously have stressed that a county's "zoning authority cannot be exercised in a manner contrary to the express provisions of the zoning enabling authority." *Cnty. of Lancaster, S.C. v. Mecklenburg Cnty., N.C.*, 334 N.C. 496, 509, 434 S.E.2d 604, 613 (1993).

The dissent also posits that the "statutory language [in sections 153A-340(a) and 153A-341] does not plainly define the limits of the powers delegated, and must be read in light of the General Assembly's intent for the entire Chapter as conveyed in sections 153A-4 and section 153-124." As a result, the dissent concludes that the plain language of sections 153A-340(a) and 153A-341 is ambiguous. This is a curious conclusion. The dissent's position appears to be premised upon an apparent lack of specificity in the statutory language. In the absence of this more precise language—it is unclear from the dis-

---

8. The dissent argues that we should apply section 153A-4 because the APFO is a "reasonably expedient" means of providing funds for public school construction. We disagree. Without belaboring the point, after thoroughly reviewing the record, we observe that the Board's actions between 2003 and 2008 to increase the VMP for single family units by 1,600 percent (from $500.00 per unit in 2003 to $8,617.00 per unit in 2008) were anything but reasonable.

sent's opinion how much more specific the language must be—the dissent argues for the broadest construction of county power possible, relying upon sections 153A-4 and 153A-124. But this argument overlooks the fact that the plain language of sections 153A-340(a) and 153A-341 provides clear guidance to counties regarding the extent of their zoning powers. Accordingly, sections 153A-4 and 153A-124 simply cannot be employed to give authority to county ordinances that do not fit within the parameters set forth in the enabling statutes. *See Cnty. of Lancaster, S.C.,* 334 N.C. at 509, 434 S.E.2d at 613 (stating that counties enjoy "considerable latitude" in exercising their powers, but recognizing that a county's "zoning authority cannot be exercised in a manner contrary to the express provisions of the zoning enabling authority"). Moreover, the dissent's argument, if adopted, would fundamentally alter the relationships between counties, which are creations of the General Assembly, and the General Assembly itself, whose power emanates directly from Article II of the North Carolina Constitution.

Notwithstanding the dissent's assertion, the General Assembly, in the past, has enacted session laws authorizing Chatham and Orange Counties to enact impact fee ordinances, which we discuss in more detail below. Act of 23 June 1987, ch. 460, secs. 4-12, 17-18.1, 1987 N.C. Sess. Laws 609, 611-13, 616-622. As a result, we conclude that the County's enactment of its APFO in this case was not within the purview of sections 153A-4 and 153A-124, but rather must be the subject of specific enabling legislation. This conclusion is bolstered by the fact that Union County (which had enacted an APFO that is almost identical to the APFO at issue here) sought—and was denied—such authority from the General Assembly on three occasions. *See Union Land Owners,* 201 N.C. App. at 375-76, 689 S.E.2d at 505 (noting that Union County had unsuccessfully sought legislative approval of school impact fees in 1998, 2000, and 2005).

The dissent contends that we "minimize the unqualified and expansive powers that the General Assembly has given counties to oversee and control development and school construction." Nothing could be farther from the truth because the legislative powers of county governments in these areas are not as broad as the dissent characterizes them. As we noted above, counties "are instrumentalities of the State government . . . subject to its legislative control," *see Comm'rs of Dare Cnty.,* 95 N.C. at 191, a proposition the dissent endorses in its opening line. As a result, counties must exercise their legislative powers within the confines of the enabling statutes

LANVALE PROPS., LLC v. CNTY. OF CABARRUS

[366 N.C. 142 (2012)]

enacted by the General Assembly. We recognize that counties enjoy flexibility in enacting ordinances, but the dissent's interpretation of sections 153A-4 and 153A-124—carried to its logical conclusion— would give counties virtual carte blanche to enact an unlimited range of ordinances affecting the use of real property no matter how tenuous the connection between the ordinance and our zoning statutes. We are not persuaded that the General Assembly intended to give counties such expansive legislative power.

The dissent further asserts that the "particular instructions" contained in section 153A-4 "are mandatory." In support of its view, the dissent cites *Homebuilders*, which states that section 160A-4 (relating to the extent of municipal authority) constitutes a "legislative mandate that we are to construe in a broad fashion the provisions and grants of power contained in section 160A." 336 N.C. at 44, 442 S.E.2d at 50 (quoting *River Birch*, 326 N.C. at 109, 388 S.E.2d at 543). But in *Smith Chapel* we did not apply section 160A-4 because the statute at issue there was "clear and unambiguous." 350 N.C. at 811, 517 S.E.2d at 878. In a footnote, the dissent attempts to brush aside our decision in *Smith Chapel* by referring to the dissenting opinion in that case. Interestingly enough, *Homebuilders* also featured a dissenting opinion. *See* 336 N.C. at 48, 442 S.E.2d at 52 (Mitchell and Webb, JJ., dissenting). But the existence of a dissenting opinion in our decisions does not undermine the decision's status as binding precedent. The statutes at issue here—section 153A-340(a) and 153A-341—are clear and unambiguous articulations of county zoning powers. As a result, *Smith Chapel* governs this case no matter how much the dissent wishes otherwise.

In reality, this case is more straightforward than the dissent's sweeping interpretation would lead the casual reader to believe. The starting point of our analysis is to establish the distinction between zoning ordinances and subdivision ordinances. "Zoning, as a definitional matter, is the regulation by a local governmental entity of the use of land within a given community, and of the buildings and structures which may be located thereon, in accordance with a general plan." *Chrismon*, 322 N.C. at 617, 370 S.E.2d at 583; *accord* 1 Arden H. Rathkopf & Daren A. Rathkopf, *Rathkopf's The Law of Zoning and Planning* § 1:3, at 1-15 (Edward H. Ziegler, Jr. ed. 2011). According to one commentator, "[t]he principal characteristic of a zoning ordinance is division of the city or county's land area into districts with a separate set of development regulations for each zone, or district." Owens, *Land Use Law*, at 40. Although specific regulations may vary

by district, the essential difference between zoning districts "is the range of land uses permitted to be located in that district." *Id.* Fundamentally, the primary purpose of county zoning ordinances is to specify the types of land use activities that are permitted, and prohibited, *within particular zoning districts. See Chrismon,* 322 N.C. at 617, 370 S.E.2d at 583. Thus, county zoning ordinances typically divide the land within a county's territorial jurisdiction into broad use categories, including, for example, agricultural, commercial, office-institutional, and residential. *See* N.C.G.S. § 153A-342(a) (2011) ("A county may divide its territorial jurisdiction into districts of any number, shape, and area that it may consider best suited to carry out the purposes of this Part. *Within these districts* a county may regulate and restrict the erection, construction, reconstruction, alteration, repair, or use of buildings, structures, or land." (emphasis added)).

As a result, general zoning ordinances are distinct from subdivision ordinances. Pursuant to section 153A-330 of the North Carolina General Statutes, a county may enact ordinances to "regulate the subdivision of land within its territorial jurisdiction." *Id.* § 153A-330 (2011). Section 153A-335 of the North Carolina General Statutes defines the term "subdivision" in part to "mean[ ] all divisions of a *tract or parcel of land* into two or more lots, building sites, or other divisions when any one or more of those divisions are created for the *purpose of sale or building development* (whether immediate or future)." *Id.* § 153-335(a) (2011) (emphases added). Thus, as a general matter, subdivision ordinances are designed to "regulate the creation of new lots or separate parcels of land." Owens, *Land Use Law,* at 49. "Unlike zoning, which controls the use of land and remains important before, during and after development, subdivision regulation generally refers to controls implemented during the development process." Julian Conrad Juergensmeyer & Daren E. Roberts, *Land Use Planning and Development Regulation Law* § 7:2, at 395 (2d ed. 2007). To this end, subdivision ordinances have several purposes, including, among other things, "facilitat[ing] record keeping regarding land ownership"; establishing "standards on the size and shape of new lots and the layout of public facilities (such as street location, intersection design, and the like)"; and "requir[ing] the provision of essential infrastructure (such as roads, utilities, recreational lands, and open space) and the details of how [that infrastructure] is to be laid out and constructed." *Id.* at 49-50 (footnote omitted). Therefore, county subdivision ordinances control the development of specific parcels of land while general zoning ordinances regulate land use

activities over multiple properties located within a distinct area of the county's territorial jurisdiction. *See Union Land Owners*, 201 N.C. App. at 378, 689 S.E.2d at 507 (citing David W. Owens, *Introduction to Zoning* 3, 129 (3d ed. 2007)).

Surprisingly, the dissent argues that "we do not need to label this ordinance as either a zoning or subdivision ordinance." The dissent's contention that the APFO's non-VMP provisions are "unremarkable" exercises of the County's zoning power also relies upon this flawed reasoning. Additionally, the dissent overstates the purposes of unified development ordinances ("UDOs"), which counties are authorized to enact pursuant to section 153A-322(d) of the North Carolina General Statutes. As a result, the dissent states that "[t]he question on the merits is not whether the APFO is a zoning ordinance or a subdivision ordinance, but whether *any* of the powers delegated by the General Assembly to counties in Chapter 153A would support the voluntary mitigation payments provision."

The dissent's contentions, however, are at odds with the County's primary argument that its APFO is authorized by its general *zoning* power. They also reflect a lack of understanding about the purpose of unified development ordinances. As Professor David W. Owens notes, "Subdivision ordinances are most commonly adopted as separate ordinances, but they are occasionally combined with zoning and other development regulations into a single ordinance regulating multiple aspects of land development (often termed a 'unified development ordinance')." Owens, *Land Use Law*, at 49. However, the functional distinctions between zoning ordinances and subdivision ordinances remain intact even when they are adopted as part of a UDO. In enacting section 153A-322(d), the General Assembly did not give counties the authority to eliminate the differentiation between zoning and subdivision ordinances. Rather, the General Assembly was providing counties with a means of compiling certain ordinances together to ensure the uniform use of "definitions and procedures." N.C.G.S. § 153A-322(d).

An understanding of the distinctions between zoning ordinances and subdivision ordinances is critical because, while both types of ordinances regulate the use of real property, they do so in very different ways. The dissent's severance argument can survive only by confusing this long-standing distinction. Severance is not an appropriate remedy because the entire APFO simply does not fall within the ambit of zoning; that is, it has little or nothing to do with the County's ability to divide its land into districts—or zones—based on

specific land uses, *see Chrismon*, 322 N.C. at 617, 370 S.E.2d at 583; N.C.G.S. § 153A-342(a) (2011), which are applicable "before, during and after development," Juergensmeyer, *Land Use Planning*, at 395.

Here the purpose and effect of the County's APFO do not fall within the purview of the County's general zoning authority. In contrast to the basic zoning concepts articulated in the plain language of sections 153A-340(a) and 153A-341, the APFO does not define the specific land uses that are permitted, or prohibited, within a particular zoning district. *See* N.C.G.S. § 153A-340(a). Instead, the APFO links County approval of residential developments to the availability of space for students in the County's public schools. If the local public schools have insufficient capacity to serve the development, developers, more often than not, are required to pay a substantial sum to the County to secure project approval.[9] Even though the ordinance allows developers to secure development approval by other means, such as waiting up to five years until the public school overcapacity issue is resolved, making significant changes to development plans, or donating land to the county's school systems, *see* Zoning Ordinance ch. 15, §§ 7, 8, the record indicates that only a few developments have been approved upon complying with these alternative conditions. In our view, the County's APFO cannot be classified as a zoning ordinance because, as plaintiff correctly observes, "the APFO simply does not 'zone.' " As a result, the County cannot rely upon its general zoning authority to enact its APFO.

The dissent argues that section 153A-342 is inconsistent with "the majority's narrow interpretation of zoning." Once again, the dissent's criticism is based on a misunderstanding of basic land use law. The first sentence of section 153A-342(a) addresses the power of counties with respect to their geography by authorizing the division of each county's "territorial jurisdiction into districts of any *number, shape, and area* that [the county] may consider best suited to carry out the purposes of this Part.[10] " N.C.G.S. § 153A-342(a) (emphasis added). In

___

9. As an illustration, in early April 2008, county staff determined that local schools were insufficient to support the Mardan IV development, *see* n.5, which comprised 168 apartment units. On 21 April 2008, the Board approved a Reservation of Capacity Certificate for the project on the condition that the Mardan IV developers pay the $4,153.00 per unit VMP. As a result, the Mardan IV developers would have been required to make a payment of $697,704.00 to secure development approval. The Mardan IV developer's Reservation of Capacity Certificate expired on 22 April 2009 because the developer failed to submit to the County the requisite development approval from Concord.

10. As further evidence of the distinction between zoning and subdivision ordinances, we observe that the statutes conveying zoning and subdivision powers on

LANVALE PROPS., LLC v. CNTY. OF CABARRUS

[366 N.C. 142 (2012)]

the second sentence, the General Assembly provided counties with the power to determine the overarching land use activities that are permitted or prohibited within each district. *Id.* (*"Within these districts* a county may regulate and restrict the erection, construction, reconstruction, alteration, repair, or use of buildings, structures, or land."). As previously noted, these activities govern general land uses such as agricultural, commercial, office-institutional, and residential. The dissent, however, reads the second sentence in isolation from the context of the first sentence. In essence, the dissent concludes that because the APFO is tied to the approval of residential developments it is a zoning ordinance. But this argument fails to account for the very specific purpose of our zoning statues. The APFO does nothing to organize the County's territorial jurisdiction into districts or zones and it does not govern specific categories of land use activities. Therefore, it cannot be classified a zoning ordinance.

In operation the APFO is a very effective means of generating revenue, as the Board's public actions demonstrate. Between 1998 and mid-August 2003, developers seeking approval of their residential developments paid the County an adequate public facilities fee of $500.00 per residential unit. On 25 August 2003, the Board increased that amount to not less than $1,008.00 per residential unit. Res. No. 2003-26. Slightly over a year later, the Board raised the APFO fee to not less than $4,034.00 per single family unit and $1,331.00 per multi-family unit. Cabarrus County, N.C., Res. No. 2004-37 (Sept. 20, 2004). In 2008 the Board increased the minimum VMP to $8,617.00 per single family unit, $4,571.00 for townhouses, and $4,153.00 per multifamily unit. Looking at just the five year period between 2003 and 2008, the Board increased the APFO's fee for single family units by more than 1,600 percent. According to the county manager's 2008 annual budget statement, the Board's decision to increase the VMP to $8,617.00 per single family unit "will produce millions more in revenue over time and help defray the amount of debt required for school construction." As noted above, the County has spent or budgeted over $267 million for school construction since the first APFO was enacted in 1998. Therefore, we must conclude that the APFO is a carefully crafted revenue generation mechanism that effectively establishes a "pay-to-build" system for developers.

---

counties are treated separately in the General Statutes. The subdivision statutes appear in Part Two of Article 18. *See* N.C.G.S. §§ 153A-330 to -336. Meanwhile, the zoning statutes are contained in Part Three of the same article. *See* N.C.G.S. §§ 153A-340 to -349.

Moreover, we cannot accept the County's argument that the APFO's VMP is "voluntary." Several statements made by county commissioners and staff illustrate this point. At the Board's 20 September 2004 meeting, one commissioner acknowledged making a statement at a previous meeting that the APFO was designed to ensure that "whoever creates the problems pays the bills." During the same meeting, the Board's vice chair stated that the APFO's consent agreements "are forced," meaning, as he expressed it, that the agreements "may be consensual in the legal forms, but in reality [they are] not." Further, at the Board's 10 July 2006 meeting, a commissioner and the county attorney had an exchange in which the county attorney explained that, although the Board could approve without conditions a development that would result in school overcrowding, construction on the project could not begin until school capacity became adequate:

"Commissioner: If that is the case we will not get the fee."

"Attorney: They will not be building either."

In light of these statements, it is clear that the VMP operates much like the mandatory school impact fee that the Court of Appeals invalidated in *Durham Land Owners Ass'n v. County of Durham*, 177 N.C. App. 629, 638, 630 S.E.2d 200, 206 (determining that Durham County could not rely on its general zoning and police powers to impose a mandatory school impact fee on developers and home builders) *disc. rev. denied*, 360 N.C. 532, 633 S.E.2d 678 (2006). *See also* Michael F. Roessler, *Public Education, Local Authority, and Democracy: The Implied Power of North Carolina Counties to Impose School Impact Fees*, 33 Campbell L. Rev. 239, 242 n.9 (2011) (noting the differences between Durham County's school impact fee and Union County's APFO but stating that the "essence of both ordinances . . . was the same: the imposition of a per-housing-unit fee on new residential development designed to generate funds to build and renovate schools"). Recognizing that the County's APFO could generate significant amounts of revenue from a possibly unpopular group—residential developers—the Board substantially increased its adequate public facilities fee over a five year period. These increases illustrate the precise harm that may occur when APFOs are adopted absent specific enabling legislation.

We also observe that the APFO's revenue generation characteristics conflict with our State's current approach to funding public education. The General Assembly has authorized counties to obtain revenue for public schools and other services from various sources,

including property taxes, *see* N.C.G.S. § 153A-149(b)(7) (2011); special assessments against property, *see id.* § 153A-185 (2011); and local government sales and use taxes, *see id.* §§ 105-495, -502 (2011). With respect to each of these sources of revenue, the burden of funding public schools is spread among a large number of individuals, including county residents and those traveling through or doing business in that county. Conversely, the APFO concentrates the majority of the financial burden for school construction on residential developers. *See Union Land Owners*, 201 N.C. App. at 381, 689 S.E.2d at 508 (stating that Union County's APFO "use[d] a VMP and other similar measures[ ] to shift impermissibly a portion of the burden for funding school construction onto developers seeking approval for new developments").

We recognize the difficulty that county governments currently face as they try to meet their statutory obligation to provide adequate public school facilities, *see* N.C.G.S. § 115C-408(b) (2011), and we applaud the County's commitment to securing additional funds for school construction. But we believe the General Assembly is best suited to address the complex issues involving population growth and its impact on public education throughout the State. We note that the General Assembly has not addressed this precise issue to date. *See Union Land Owners*, 201 N.C. App. at 375, 689 S.E.2d at 505. Without expressing an opinion on the policy merits of APFOs, we stress that absent *specific* authority from the General Assembly, APFOs that effectively require developers to pay an adequate public facilities fee to obtain development approval are invalid as a matter of law. Accordingly, we conclude that the County's first argument lacks merit.

VI

[2] We now turn to the County's argument that its APFO was authorized by Session Law 2004-39, which states:

> Notwithstanding the provisions of Article 19 of Chapter 160A of the General Statutes, the County of Cabarrus or any municipality therein may enforce, within its jurisdiction, any provision of the school adequacy review performed under the Cabarrus County Subdivision Regulations, including approval of a method to address any inadequacy that may be identified as part of that review.

Ch. 39, sec. 5, 2004 N.C. Sess. Laws at 47. The County argues that Session Law 2004-39 provides "special authorization to 'adopt' and 'enforce' its APFO as an exception to the general zoning and subdivision-regulation statutes." The County asserts that its power to

"enforce" the APFO "necessarily and logically includes" the authority to adopt the APFO. We are not persuaded.

"When interpreting a statute, we ascertain the intent of the legislature, first by applying the statute's language and, if necessary, considering its legislative history and the circumstances of its enactment." *Shaw v. U.S. Airways, Inc.*, 362 N.C. 457, 460, 665 S.E.2d 449, 451 (2008). Applying these rules of statutory construction to Session Law 2004-39, we identify several flaws in the County's arguments.

First, our review of the session law's plain language belies the County's "adopt and enforce" argument. Most notably, the word "adopt" does not appear anywhere in the text of the session law. If the legislature had intended to authorize the County to adopt an APFO such as the one at issue, it could have done so expressly. In 1987 the General Assembly expressly authorized Chatham and Orange Counties to impose impact fees on residential developers to support the provision of public facilities, including schools. Act of June 23, 1987, ch. 460, secs. 4-12.1, 17-18.1, 1987 N.C. Sess. Laws 609, 611-13, 616-622. For example, with respect to Chatham County, the General Assembly stated:

> The Board of Commissioners of a county may provide by ordinance for a system of impact fees to be paid by developers to help defray the costs to the county of constructing certain capital improvements, the need for which is created in substantial part by the new development that takes place within the county.

*Id.*, sec. 4(a). This language conclusively demonstrates that the General Assembly knows how to convey upon counties specific authority to adopt ordinances similar to the one before us. With respect to APFOs in general, our research discloses no instance in which the General Assembly has acted upon the requests of county governments for legislation authorizing them to adopt these ordinances. *See Union Land Owners*, 201 N.C. App. at 375, 689 S.E.2d at 505 (noting that Union County had unsuccessfully sought legislative approval of school impact fees in 1998, 2000, and 2005). As we previously observed, Union County's APFO was almost identical to the one we consider and reject today. *Id.* at 375-76, 689 S.E.2d at 505. Therefore, in the absence of express language authorizing the adoption of the APFO, we cannot accept the County's strained interpretation of Session Law 2004-39.

Even assuming that the session law's language is ambiguous enough to allow us to entertain the County's position, the circum-

stances surrounding enactment of Session Law 2004-39 indicate that the General Assembly did not intend for the session law to authorize the County to adopt its APFO. Rather, the record shows that the session law was an effort to address the confusion between the County and several municipalities regarding enforcement of the APFO. The record contains ample evidence that Concord and Kannapolis chose not to enforce the ordinance within their municipal jurisdictions because of the fees themselves and concerns about whether the County had authority to collect the fees within their jurisdictional boundaries. On 12 August 2004, the county manager sent letters to the city managers of Concord and Kannapolis informing them that pursuant to the new session law, the APFO now applied to all municipalities in the County. The next day—13 August 2004—Concord's city manager sent a memorandum to Concord's mayor, members of the city council, and the city attorney expressing doubt that Session Law 2004-39 clarified "the municipalities' ability to collect [the APFO] fee," but stating that the city staff "thought there was a way it could be done." The city manager also wrote that he had explained to the county manager during a telephone call that attempts by the County to revise the APFO without consulting Concord "would not be received well." According to the memorandum, the county manager understood these concerns, but felt that the County "needed to go ahead [with the revisions] so [it] c[ould] position [itself] to try to get the [APFO] fees from the developers."

On 16 August 2004, slightly over a month after Session Law 2004-39 was enacted, the county manager told the Board during its monthly meeting that the session law "authorized Cabarrus County to enforce its school adequacy requirements countywide, including within the corporate limits of the municipalities." Following the county manager's statement and a presentation by a member of the County's planning department staff regarding school construction capital costs, the Board engaged in a discussion about its adequate public facilities policy. Several issues were raised, including "enforcement [of the APFO] within municipalities." During this exchange the Board's vice chair expressed "concerns about the legality of the [APFO's] advancement requirement and stated [that] a higher fee would have a negative impact on the building industry and the economy of Cabarrus County." Notwithstanding this statement, the commission voted four to one, with the vice chair in dissent, to approve a resolution that, among other things, stated:

New development within the corporate limits of any of the cities and towns located in Cabarrus County shall also be subject to the

adequacy review through the <u>Cabarrus County Subdivision Regulations</u> Chapter 4, Section 17 "Adequate Public Facilities Standards," as provided for by Session Law 2004-39, House Bill 224, which became effective June 30, 2004.

Res. No. 2004-30. According to the meeting minutes and the text of this resolution, the Board and county staff believed Session Law 2004-39 was intended to address APFO enforcement concerns involving the municipalities located within Cabarrus County, not to give the County authority to enact the APFO.

This point is corroborated by correspondence between county and municipal staff following the Board's 16 August 2004 meeting. On 20 August 2004, the interim city manager for Kannapolis responded to the county manager's 12 August 2004 letter by saying that he was "not convinced that" Session Law 2004-39 "authorize[d] the County to collect [APFO] fees within our City limits in the manner in which you have described to me." On 26 October 2004, the County's planning and zoning manager sent a letter to the Kannapolis planning director stating in part: "In [Session Law 2004-39], authority was granted to the County to enforce Adequate Public Facility standards through all areas within the County including those areas within municipal boundaries." Additionally, the planning and zoning manager wrote that the Board's 16 August 2004 resolution expressed "the County's intent to enforce Adequate Public Facility standards within the municipalities." None of this correspondence shows that Session Law 2004-39 was intended to give the County authority to *adopt* its APFO.

Apparently anticipating the weakness of its argument, the County contends in its brief that "it would have made no sense for the [General Assembly] to use the word 'adopt' when the APFO had already been in existence for a number of years." Ironically, the existence of the County's APFO before enactment of Session Law 2004-39 further undermines the County's "adopt and enforce" theory. The record demonstrates that county officials believed (mistakenly) that the County already had statutory authority to enact the APFO. The County's commerce director admitted in his 24 April 2009 deposition that the County did not rely upon Session Law 2004-39 as authority for the APFO stating, "We had an APFO prior to that." Notably, the commerce director's deposition was taken several months before the Court of Appeals invalidated Union County's APFO in *Union Land Owners*. Thus, it appears that the County's "adopt and enforce" argument is a relatively recent development.

As a final note, even if we assume *arguendo* that Session Law 2004-39 authorized the County to adopt its APFO, we do not believe that the legislature intended to give the County unfettered authority to enact this revenue-driven ordinance. Our conclusion is derived from the substantial differences between the APFO's initial version and its current iteration, the General Assembly's reluctance to authorize the imposition of school impact fees, and the Court of Appeals' decision in *Durham Land Owners*.

The current APFO effectively requires developers to pay a substantial adequate public facilities fee to receive development approval. In practice, the Board has leveraged this dynamic to generate substantial revenues for the County, which once again, demonstrates the precise harm that APFOs may inflict on unpopular groups. Such government action should not be permitted without specific enabling legislation enacted by the General Assembly.

Moreover, as noted above, when the session law was enacted, the General Assembly already had rejected requests by another county to authorize the imposition of school impact fees. *See Union Land Owners*, 201 N.C. App. at 375, 689 S.E.2d at 505 (noting that Union County had unsuccessfully sought legislative approval of school impact fees in 1998, 2000, and 2005). In addition, in 2006 the Court of Appeals invalidated Durham County's mandatory school impact fee. *Durham Land Owners*, 177 N.C. App. at 638, 630 S.E.2d at 206 (determining that Durham County could not rely on its general zoning and police powers to impose a mandatory school impact fee on developers and home builders).

One of the implied premises of the County's "adopt and enforce" argument is that by enacting Session Law 2004-39, the General Assembly intended to grant the County unconditional authority to expand substantially the scope of its APFO, from a simple adequacy review process into a complex revenue generating system. We reject this proposition. Again, assuming *arguendo* that Session Law 2004-39 authorized adoption of the APFO, we simply do not believe that the General Assembly intended for the session law to give the County the power to adopt an APFO with the broad scope that we consider and reject today.

In sum, we hold that Session Law 2004-39 did not authorize the County to enact its APFO. As a result, we do not address the parties' arguments regarding whether the session law actually authorized the County to enforce the APFO within the corporate boundaries of the County's municipalities.

## VII

**[3]** Finally, we consider the County's argument that plaintiff's action was barred by the statutes of limitations that were in effect when plaintiff filed its initial complaint on 4 April 2008. Specifically, the County contends it was entitled to summary judgment pursuant to sections 153A-348 (2009) and 1-54.1 (2009) of the North Carolina General Statutes.[11] We disagree.

Pursuant to section 153A-348: "A cause of action as to the validity of any zoning ordinance, or amendment thereto, adopted under this Part or other applicable law shall accrue upon adoption of the ordinance, or amendment thereto, and shall be brought within two months as provided in G.S. 1-54.1." N.C.G.S. § 153A-348 (2009). Section 1-54.1 requires a party to file:

> Within two months an action contesting the validity of any zoning ordinance or amendment thereto adopted by a county under Part 3 of Article 18 of Chapter 153A of the General Statutes or other applicable law or adopted by a city under Chapter 160A of the General Statutes or other applicable law.

*Id.* § 1-54.1 (2009).

The County argues that plaintiff filed its complaint well over two months after the County revised the APFO on 20 August 2007. In addition, the County asserts that the Court of Appeals erred by relying on its decision in *Amward Homes, Inc. v. Town of Cary* to reject the County's statute of limitations argument. *See Amward Homes*, 206 N.C. App. at 53-54, 698 S.E.2d at 416 (holding that the two-month statute of limitations governing municipal ordinances did not bar the plaintiff's cause of action "because [the ordinance at issue was] a subdivision ordinance rather than a zoning ordinance"). In support of its position, the County urges us to consider "the <u>substance</u> of the [APFO] to determine whether it regulates those matters set out in the zoning enabling statute . . . , or those matters set out in the subdivision-regulation statutes."

---

11. The General Assembly substantially revised sections 153A-348 and 1-54.1 in 2011. *See* Act of June 17, 2011, ch. 384, secs. 2, 3, 2011 5 N.C. Adv. Legis. Serv. 465, 465-66 (LexisNexis). These revisions do not apply to this case. *See id.*, sec. 7 at 467 ("This act becomes effective July 1, 2011, but the provisions of Sections 1 through 4 of this act, to the extent they effect a change in existing law, shall not apply to litigation pending on that date."). We therefore analyze the County's statute of limitations argument using the versions of these statutes that were in effect when plaintiff filed its initial complaint.

As discussed above, after reviewing the substance of the APFO, we conclude that it is not a zoning ordinance. Rather, the APFO impermissibly places the burden of funding public school construction on developers by using a revenue generating mechanism that is disguised as a zoning ordinance. Because the APFO is not a zoning ordinance, plaintiff's action is not time barred by sections 153A-348 and 1-54.1.

## VIII

In conclusion, we hold that (1) the County did not have statutory authority to adopt its APFO; (2) Session Law 2004-39 did not authorize enactment of the APFO; and (3) plaintiff's cause of action is not time barred. Accordingly, we affirm the decision of the Court of Appeals.

AFFIRMED.

Justice HUDSON dissenting.

I agree with the majority that counties are instrumentalities of the State, with powers granted by the General Assembly. "But it is also true that a municipal corporation may exercise all the powers within the fair intent and purpose of its creation which are reasonably necessary to give effect to the powers expressly granted, and in doing this it may exercise discretion as to the means to the end." *Riddle v. Ledbetter*, 216 N.C. 491, 493, 5 S.E.2d 542, 543 (1939) (citations omitted). I respectfully dissent because (1) the majority opinion is overly broad, striking down the entire APFO and effectively foreclosing all future APFO-like efforts when it only needed to sever the voluntary mitigation payment provision, and (2) the majority's decision conflicts with the plain language of N.C.G.S. Chapter 153A, as well as its intent.

### I. Severance

The majority here strikes down the entire APFO based primarily on its determination that the voluntary mitigation payments provision of the APFO exceeds the county's authority under the General Statutes. In doing so, the majority passes over, with minimal explanation, the obvious remedy required when only one provision of an ordinance is statutorily unauthorized: severance of the offending provision.[12]

The majority opinion analyzes only one provision of the entire twenty page APFO: the voluntary mitigation payment provision, to

---

12. The County specifically requested severance as an alternative outcome at the Court of Appeals and before this Court.

which it refers as a "carefully crafted revenue generation mechanism" "disguised as a zoning ordinance." Underlying the analysis in the majority opinion is its characterization of the VMP as a mandatory fee.[13] As will be discussed below, the VMP is not mandatory; it is one of five options in the APFO from which a developer may choose if current school capacity is determined to be inadequate for the proposed development. If the VMP is truly the only problematic provision, then the majority could easily reach the same result by severing that provision, without undermining the county's authority to provide for orderly growth and development.

"The test for severability is whether the remaining portion of the legislation can stand on its own and whether the [legislative body] would have enacted the remainder absent the offending portion." *Pope v. Easley*, 354 N.C. 544, 548, 556 S.E.2d 265, 268 (2001) (per curiam) (citation omitted). As described in Section III.A below, the APFO without the voluntary mitigation payment provision can "stand on its own," *id.*, as it is an unremarkable exercise of the powers granted to counties under Chapter 153A of the North Carolina General Statutes. As to whether the legislative body "would have enacted the remainder absent the offending portion," "the inclusion of a severability clause within legislation will be interpreted as a clear statement of legislative intent to strike an unconstitutional provision and to allow the balance to be enforced independently." *Id.* (citation omitted). Here section 15-21 of the APFO explicitly states that "[i]f any portion, clause or sentence of this ordinance shall be determined to be invalid or unconstitutional, such declaration of invalidity shall not affect the remaining portions of this ordinance." Because the remainder of the APFO here is sound, the voluntary mitigation payment provisions are severable, and the majority's sweeping rejection of the entire APFO is unnecessary as well as contrary to the enabling statutes at issue.

The majority states that "[s]everance is not an appropriate remedy because the entire APFO simply does not fall within the ambit of zoning." The entire APFO, with or without the VMP provision, contains extensive provisions detailing methods of calculating school impact and various mitigation measures developers could take to address inadequate school capacity. These provisions and others appear to me to be within the scope of regulating and restricting the use of land and

---

13. The majority states its holding as follows: "[A]bsent specific authority from the General Assembly, APFO's that effectively require developers to pay an adequate public facilities fee to obtain development approval are invalid as a matter of law."

buildings for residence and other purposes, as intended by the General Assembly. N.C.G.S. § 153A-340(a) (2011). At no point does the majority explain how denying a development application in light of inadequate school capacity, delaying development until school capacity is adequate, or requiring the developer to modify the development application to address inadequate school capacity are not authorized by statute.

By failing to sever the VMP provision, the majority appears to have created a situation in which the county is powerless to delay or deny development applications in light of inadequate school capacity, and now has few choices beyond raising property taxes on existing residents to pay for schools that will serve the new residents who move into the new development.

"The history of the Supreme Court of North Carolina has been one of judicial restraint . . .." *State v. Waddell*, 282 N.C. 431, 476, 194 S.E.2d 19, 48 (1973) (Sharp, J., concurring in part and dissenting in part). In my view, this Court could and should exercise such restraint and uphold the remaining inoffensive, uncontroversial, and statutorily authorized provisions of the APFO. Severing the voluntary mitigation payment provisions while upholding the remainder of the APFO is the most the Court should have done here in light of the plain language of N.C.G.S. Chapter 153A. But in light of other provisions of the statute and the special legislation affecting Cabarrus County ("Session Law 2004-39"), I further conclude that the Court should uphold the entire APFO as written.

## II. Matters Preliminary to the Merits

### A. The Interpretive Framework

To explain why the entire APFO should be upheld, I begin with a discussion of the provisions in Chapter 153A in which the General Assembly specifically and clearly articulated the intent behind these statutory delegations of authority. By ignoring these provisions, the majority misreads the individual provisions of the statute at issue here. Legislative intent "is the guiding star in the interpretation of statutes." *Moore v. Adams Elec. Co.*, 264 N.C. 667, 673, 142 S.E.2d 659, 665 (1965) (citations and quotation marks omitted). The legislature's intent in delegating certain powers to counties is clearly indicated in two important provisions of Chapter 153A, one of which the majority regards as "inapposite" (section 153A-4), and the other of which the majority ignores entirely (section 153A-124). Section 153A-4 reads:

It is the policy of the General Assembly that the counties of this State should have adequate authority to exercise the powers, rights, duties, functions, privileges, and immunities conferred upon them by law. To this end, the provisions of this Chapter and of local acts *shall be broadly construed* and grants of power *shall be construed to include any powers that are reasonably expedient* to the exercise of the power.

N.C.G.S. § 153A-4 (emphases added) (2011). Section 153A-124 drives home the same point:

The enumeration in this Article or other portions of this Chapter of specific powers to define, regulate, prohibit, or abate acts, omissions, or conditions *is not exclusive*, nor is it a limit on the general authority to adopt ordinances conferred on counties by G.S. 153A-121.

*Id.* § 153A-124 (emphasis added) (2011). The plain language of these two sections indicates a specific legislative will that all provisions of Chapter 153A be read broadly to effectuate the goals of the General Assembly in granting numerous powers to local governments.

The sections of the statute at issue here read in pertinent part:

A zoning ordinance may regulate and restrict the height, number of stories and size of buildings and other structures, the percentage of lots that may be occupied, the size of yards, courts and other open spaces, the density of population, and the location and use of buildings, structures, and land for trade, industry, residence, or other purposes.

N.C.G.S. § 153A-340(a).

Zoning regulations shall be designed to promote the public health, safety, and general welfare. To that end, the regulations may address, among other things, the following public purposes: to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population; to lessen congestion in the streets; to secure safety from fire, panic, and dangers; and to facilitate the efficient and adequate provision of transportation, water, sewerage, schools, parks, and other public requirements. The regulations shall be made with reasonable consideration as to, among other things, the character of the district and its peculiar suitability for particular uses, and with a view to conserving the value of buildings and encouraging the

most appropriate use of land throughout the county. In addition, the regulations shall be made with reasonable consideration to expansion and development of any cities within the county, so as to provide for their orderly growth and development.

*Id.* § 153A-341 (2011).

The majority circumvents section 153A-4 by claiming that the statutory language in these zoning enabling statutes, N.C.G.S. §§ 153A-340, et seq., is plain, and therefore, no construction is necessary and section 153A-4 does not apply. This interpretive evasion is untenable for two reasons: first, because section 153A-4 is not an optional provision, and second, because the language in the zoning statutes is not plain.

First, section 153A-4 is not an optional provision of the statute. While interpretive instructions in statutes are not generally binding upon this Court, we have previously ruled—twice—that these particular instructions are mandatory: "We treat this language as a 'legislative mandate that we are to construe in a broad fashion the provisions and grants of power contained' " in the statute. *Homebuilders Ass'n of Charlotte v. City of Charlotte*, 336 N.C. 37, 44, 442 S.E.2d 45, 50 (1994) (quoting *River Birch Assocs. v. City of Raleigh*, 326 N.C. 100, 109, 388 S.E.2d 538, 543 (1990)) (discussing an identical provision in N.C.G.S. § 160A-4, which relates to city powers). The language of section 153A-4 is abundantly clear in *mandating* that we read all other sections of Chapter 153A broadly, not just when we decide they are ambiguous, but all the time.[14] The majority states, without citing authority, that this provision is not a "general directive" but instead is a "rule of statutory interpretation" that only applies if another section is ambiguous. This view is contrary to the rulings of this Court cited above and imposes limitations the General Assembly did not enact. Moreover, the majority acknowledges that section 153A-4 applies "when its application is necessary to give effect to any powers that

---

14. Admittedly, this is not the first time this Court has ignored its precedent in *Homebuilders Ass'n* and avoided applying the General Assembly's interpretive mandate. In *Smith Chapel Baptist Church v. City of Durham* this Court declared the language of a city authority statute plain without any mention of section 160A-4 (the provision in the municipal powers statute identical to section 153A-4). 350 N.C. 805, 811, 517 S.E.2d 874, 878 (1999). In *Smith Chapel*, the majority's avoidance of the interpretive mandate drew a sharp rebuke from three dissenting justices. *See id.* at 819, 517 S.E.2d at 883 (Frye, J., Mitchell, C.J., & Parker, J., dissenting) ("[T]he majority takes an unduly narrow view of the City's authority."); *id.* at 821, 517 S.E.2d at 884 ("N.C.G.S. § 160A-4 and *Homebuilders Ass'n of Charlotte* require us to interpret the applicable public enterprise statutes broadly . . . .").

LANVALE PROPS., LLC v. CNTY. OF CABARRUS

[366 N.C. 142 (2012)]

are reasonably expedient to [a county's] exercise of the power." Here the APFO exercises powers—delaying development and collecting payments in exchange for expedited development rights—reasonably expedient to the exercise of the express power to regulate and restrict land use for the purpose of providing adequate public schools. The application of section 153A-4 is necessary to "give effect" to these reasonably expedient measures.[15] As such, even within the majority's own narrow view of N.C.G.S. § 153A-4, that section applies here.

The majority completely omits any discussion of section 153A-124, which states that the enumerated list of powers is not exclusive. The majority's interpretation—that the lack of an explicit provision enabling voluntary mitigation payments means that such payments are not authorized—is frankly inexplicable in light of this provision. Section 153A-124 expressly states that the enumeration of powers in the statutes that compose Chapter 153A "is not exclusive, nor is it a limit on the general authority to adopt ordinances." N.C.G.S. § 153A-124. This language can only mean that the General Assembly did not intend to limit county powers to those it specifically named in each statute at the time of its passage, but rather anticipated giving local governing bodies significant discretion in how to exercise their "general authority to adopt ordinances." *Id.* As with section 153A-4, nothing in section 153A-124 suggests it should be applied only when the statutory language at issue is ambiguous; it is rather a general guideline that the provisions of the Chapter should always be read broadly to meet the purposes expressed by the General Assembly. Sections 153A-4 and 153A-124 are not optional provisions, and the majority ignores the express will of the General Assembly by failing to apply those provisions in this case.

As such, when I turn to the particular zoning (and subdivision) provisions at issue here, I read them in the context of these expressions of intent by the General Assembly. But even if these sections only apply to ambiguous statutory language, they must still be applied here because the language in sections 153A-340 and 153A-341 is ambiguous. The majority concludes that "[s]ections 153A-340(a)

---

15. The majority dismisses this argument, noting that the County repeatedly raised the VMP amounts, which it claims are not "reasonable." The statutory text clearly uses the phrase "powers that are reasonably expedient," with the word "expedient" modifying "powers" and the word "reasonably" (not "reasonable") modifying "expedient." The reasonableness of the VMP amounts has no bearing on whether the measure is "reasonably expedient to the exercise of" the expressly granted powers. *See* N.C.G.S. § 153A-4.

and 153A-341 express in unambiguous language the General Assembly's intent to delegate general zoning powers to county governments," and thus declares section 153A-4 "inapposite." While I agree that these provisions "express in unambiguous language" an "intent to delegate general zoning powers," that is not the appropriate question here. The appropriate question is whether the language *describing the general zoning powers to be delegated* is plain. It is the content and extent of the delegation that must be plainly expressed if we are to avoid any statutory construction. In these sections, the General Assembly authorizes counties to adopt ordinances which "regulate and restrict the . . . use of buildings, structures, and land for trade, industry, residence, or other purposes." N.C.G.S. § 153A-340(a). Moreover, counties "may address, among other things . . . the efficient and adequate provision of schools . . . ." N.C.G.S. § 153A-341.

I conclude that this statutory language does not plainly define the limits of the powers delegated and must be read in light of the General Assembly's intent for the entire Chapter as conveyed in sections 153A-4 and 153A-124. The plain language of sections 153A-340(a) and 153A-341 does no more than simply and broadly authorize, among other things, the regulation and restriction of the use of land for residence purposes and gives examples of the types of public purposes counties may address. The question before us, therefore, is whether this general language authorizes the particular regulation and restriction of the use of land created in the ordinance at issue. *See Offutt Hous. Co. v. Cnty. of Sarpy*, 351 U.S. 253, 260, 76 S. Ct. 814, 819 (1956) ("[Congress] has preferred to use general language and thereby requires the judiciary to apply this general language to a specific problem. To that end we must resort to whatever aids to interpretation the legislation in its entirety and its history provide."). The statute here is conspicuously silent on the reach of the general power to "regulate and restrict" land use under section 153A-340(a), leaving significant discretion in the hands of the counties. Therefore, the specific limit of that general grant of power in this context is unmistakably a question of statutory construction. Sections 153A-4 and 153A-124 must be applied and all provisions must be construed broadly.

These mandates from the General Assembly to read Chapter 153A broadly have real significance. Most statutes do not contain such interpretive guidance. "These provisions evince an evident legislative purpose to give local governments considerable flexibility

and discretion . . . ." *Maready v. City of Winston-Salem*, 342 N.C. 708, 729, 467 S.E.2d 615, 628 (1996). The General Assembly intentionally gave counties very broad powers to operate in those areas assigned to them, one of which is the provision of capital facilities for schools. *See* N.C.G.S. § 115C-408 (2011). Whether we agree with the policy advanced or not, we should be very cautious in second-guessing, and even negating, the General Assembly's decisions on this legislative matter.

### B. General Discussion of Zoning

Regarding another general matter, I am troubled by the majority's broad discussion of the definitions of zoning and subdivision ordinances. As an initial point, given the statutory framework, we do not need to label this ordinance as either a zoning or subdivision ordinance. Clearly, zoning and subdivision powers are distinct, but the General Statutes also authorize unified development ordinances that include powers found throughout Chapter 153A:

> A county may elect to combine any of the ordinances authorized by this Article into a unified ordinance. Unless expressly provided otherwise, *a county may apply any of the definitions and procedures authorized by law to any or all aspects of the unified ordinance* and may employ any organizational structure, board, commission, or staffing arrangement authorized by law to any or all aspects of the ordinance.

N.C.G.S. § 153A-322(d) (2011) (emphasis added). *See also* N.C.G.S. §§ 153A-330 (2011), -340(a). Because counties are specifically authorized to select and combine powers from throughout Chapter 153A in a unified development ordinance, the question on the merits is not whether the APFO is a zoning ordinance or a subdivision ordinance, but whether *any* of the powers delegated by the General Assembly to counties in Chapter 153A would support the voluntary mitigation payments provision.

Nevertheless, to the extent the majority determines that the APFO is clearly not a zoning ordinance, I disagree: it certainly contains some elements of a zoning ordinance.[16] The majority claims that

---

16. The majority addresses the statute of limitations issue by holding that the APFO is not a zoning ordinance and thus the challenge is not time-barred. But even calling the APFO a zoning ordinance does not create an issue with the statute of limitations. Three days before plaintiff filed the complaint, the Cabarrus County Board of Commissioners amended the Cabarrus County Zoning Ordinance by deleting the existing APFO and adding a substantially revised APFO. In my view, this action reset the two-month statute of limitations.

"the County's APFO cannot be classified as a zoning ordinance because . . . 'the APFO simply does not 'zone.' '" This conclusion seems to arise from the majority's determination that the "principal characteristic" or "primary purpose" of zoning is the division of land into zones for various uses. In its discussion the majority appears to hold, or at least to strongly suggest, that zoning is limited to that regulation which relates to the creation of districts for land use.

While zoning may be theoretically about creating land use districts, in reality zoning is whatever the General Assembly has said it is. And the General Assembly has granted to counties zoning power much broader and more nuanced than just what is needed to create general zoning districts. In subsection 153A-340(a), quoted in part above, the General Assembly defines the zoning power as including the power to "regulate and restrict" many things, including "the location and use of buildings, structures, and land for trade, industry, residence, or other purposes." In section 153A-341, also quoted in part above, the General Assembly adds that "regulations may address" a host of "public purposes" including "to facilitate the efficient and adequate provision of . . . schools." Most inconsistent with the majority's narrow interpretation of zoning is section 153A-342:

> A county may divide its territorial jurisdiction into districts of any number, shape, and area that it may consider best suited to carry out the purposes of this Part. *Within these districts a county may regulate and restrict the erection, construction, reconstruction, alteration, repair, or use of buildings, structures, or land.*

*Id.* § 153A-342(a) (2011) (emphasis added). The majority quotes but does not recognize the significance of the emphasized portion. The APFO clearly "regulate[s] and restrict[s]" the "erection" and "use of buildings" and "land" within residential zoning districts. Section 153A-342(a) illustrates the process the County followed here: first, it created zoning districts wherein residential development may occur; second, it applied the APFO, which "regulate[s] and restrict[s] the . . . use of . . . land" specifically "within these [residential] districts." *Id.* The majority's excessively narrow definition of zoning—that "the ambit of zoning" is limited to "the County's ability to divide its land into districts—or zones—based on specific land uses"—recognizes only the first sentence of section 153A-342(a).

All these provisions fall under what the General Assembly labeled as the "Zoning" part of Article 18 of Chapter 153A. Whether or

not scholars and theorists define zoning narrowly, our legislature has defined it broadly. What Cabarrus County has created is an ordinance that unmistakably exercises zoning powers as defined and delegated by the General Statutes.

Moreover, even applying the majority's definition of zoning as "regulat[ing] land use activities over multiple properties," this APFO does just that. In particular, I find curious the following statement in the majority opinion: "[T]he APFO does not define the specific land uses that are permitted, or prohibited, within a particular zoning district. *See* N.C.G.S § 153A-340(a). Instead, the APFO links County approval of residential developments to the availability of space for students in the County's public schools." The problem with this approach is that the language of section 153A-340(a) does not specifically limit zoning ordinances to those which "define the specific land uses that are permitted, or prohibited, within a particular zoning district." Rather, the statute authorizes counties to "regulate and restrict the . . . use of . . . land for . . . residence . . . purposes." N.C.G.S. § 153A-340(a). It seems clear to me that conditioning approval of residential development on the existence of adequate public school capacity is the very definition of a regulation ("[t]he act or process of controlling by rule or restriction," *Black's Law Dictionary* 1311 (8th ed. 2004)) or restriction of the use of land. Thus, the APFO does "regulate and restrict" the use of land within land use districts that allow residential development. Linking approval of residential development to school adequacy is a textbook example of an exercise of the zoning power granted in Article 18 of Chapter 153A, and the distinction the majority attempts to draw is simply illusory. Consistent with sections 153A-340(a) and -341, the alternative mitigation options in the ordinance reflect the county's "consideration of expansion and development . . ." so as "to address the . . . adequate provision of . . . schools." N.C.G.S. §§ 153A-340(a), -341.

The majority seems to conclude that Cabarrus County's APFO is a subdivision ordinance. Applying the same logic the majority uses—that the APFO cannot be called a zoning ordinance because it "simply does not zone"—one would conclude that the County's APFO cannot be classified as a subdivision ordinance because it "simply does not" subdivide. As the majority notes, subdivision is defined as "all *divisions* of a tract or parcel of land into two or more lots." N.C.G.S. § 153A-335 (2011) (emphasis added). The APFO here does not regulate *divisions* of a tract or parcel of land. Rather, it regulates the *use* of the lots, specifically the number of housing units planned by the devel-

oper. The APFO is concerned with the number of housing units (a zoning issue), not the number of subdivided lots (a subdivision issue).

The majority states that "county subdivision ordinances control the development of specific parcels of land while general zoning ordinances regulate land use activities over multiple properties located with a distinct area of the county's territorial jurisdiction." Even this attempt to draw a clear distinction between subdivision and zoning regulations fails to explain how this APFO is not a zoning regulation. The APFO clearly "regulate[s] land use activities"—by controlling the approval process for large residential construction and development projects. It acts "over multiple properties"—all properties in any residential district in the county that are going to be developed into more than five housing units. The properties regulated are "located within a distinct area of the county's territorial jurisdiction"—the area served by a particular public school within that residential district. Thus, even under the majority's new and limited definition of zoning, the APFO still zones.

In sum, the majority's efforts to distinguish subdivision and zoning are unnecessary in light of N.C.G.S. 153A-322(d), and the majority fails to explain how this APFO does not directly implicate the statutorily granted power to "regulate and restrict the . . . use of . . . land for . . . residence . . . purposes," a power expressly found in the zoning enabling statute. N.C.G.S. § 153A-340(a).

### III. Authority for the APFO

### A. General Authority for the APFO without VMPs

As noted in Section I regarding severance, the majority does not at any point substantively address the nearly twenty pages of Cabarrus County's APFO that do not involve VMPs. It appears to me that the APFO provisions other than the VMP provision are well within the authority granted by the General Assembly to counties in Chapter 153A. Minus the VMPs, Cabarrus County's APFO simply allows the county to review large residential development proposals for their impact on the public school system and, when a significant negative impact is found, allows the county to temporarily delay some or all of the development to help mitigate that negative impact.

In my view, the power to temporarily delay development in light of inadequate public school capacity falls squarely within the statutory powers delegated to counties by the General Assembly. Counties are expressly granted the authority to "regulate and restrict . . . the location and use of buildings, structures, and land for trade, industry,

*residence,* or other purposes." *Id.* § 153A-340(a) (emphases added). The General Assembly also specifically names some of the purposes for which the powers granted in section 153A-340 may legitimately be used, one of which is "to facilitate the efficient and adequate provision of . . . schools." *Id.* § 153A-341. Notably, the General Assembly does not define the exact types of regulations and restrictions that can be imposed on the use of land for residential purposes, nor does it specify how a county might create zoning regulations to facilitate the adequate provision of schools. The General Assembly has left the creation of these regulations to the sound discretion of local governments, while requiring that they be made with

> reasonable consideration as to, among other things, the character of the district and its peculiar suitability for particular uses, and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout the county. In addition, the regulations shall be made with reasonable consideration to expansion and development of any cities within the county, so as to provide for their orderly growth and development.

*Id.* I have seen no analysis, and the majority provides none,[17] that would place the basic power to delay or withhold development approval to mitigate impact on overcrowded public schools outside of the express statutory authority to regulate or restrict land use so as to provide for counties' orderly growth and development and "to facilitate the efficient and adequate provision of . . . schools." *Id.*

In addition, the General Assembly has expressly given counties the power to temporarily halt all development in a county. N.C.G.S. § 153A-340(h) (2011) (stating that "counties may adopt temporary moratoria on any county development approval required by law").[18] Certainly, if the County can temporarily halt all development to address a given concern, it can temporarily delay specific develop-

---

17. Even the majority's specific response to the severance discussion in this dissent provides no detailed analysis of any non-VMP provision of the APFO. The majority simply asserts that "the entire APFO simply does not fall within the ambit of zoning." The majority provides no reasoning, statutory authority, or case citations for the idea that a county may not deny development applications, delay development, or require developers to modify non-conforming development applications, in light of inadequate school capacity.

18. This APFO is not a temporary moratorium because it is narrowly conditioned on specific inquiries into school adequacy in the particular area proposed for development, and because it involves discretion rather than a blanket ban. However, the APFO conforms in broad terms to the requirements described in section 153A-340(h) for valid temporary moratoria.

ment that particularly affects that concern. Our Court of Appeals has previously upheld a county's denial of a development application because of school capacity concerns. *Tate Terrace Realty Investors, Inc. v. Currituck County*, 127 N.C. App. 212, 223, 488 S.E.2d 845, 851 (upholding the Board of Commissioners' decision to deny development permit for 601-lot subdivision when, *inter alia*, "substantial competent evidence in the record supported the Board's . . . conclusion that petitioner's proposed development 'fail[ed] to meet the provision of Section 1402(2)(e) of the [County's Unified Development Ordinance] because it exceeds the county's ability to provide adequate public school facilities' " (first set of brackets in original)), *disc. rev. denied*, 347 N.C. 409, 496 S.E.2d 394 (1997). If a county may deny development applications outright based on school capacity concerns, surely it can insist on reasonable delays of development to allow for new school construction as well. The APFO without the voluntary mitigation payment provision does exactly that, which is well within the statutory grant of power found in Chapter 153A.

### B. General Authority for Voluntary Mitigation Payments

With the interpretive framework described in Section II.A in mind, it is an easy step from the general and uncontroversial authority to review school adequacy and delay development to the more specific and controversial authority to offer builders the choice either to delay development or to engage in voluntary mitigation measures, one of which is the payment of fees.[19] The voluntary mitigation measures prescribed by the ordinance, which include phasing or modifying the development plans, as well as the possibility of paying for schools, are "reasonably expedient" measures in the exercise of the power to regulate or restrict the use of land for residences with the purpose of providing adequate schools. Thus, applying section 153A-4, we should construe the voluntary mitigation measures to be included with the express textual grants of power.

Our decision in *Homebuilders Ass'n of Charlotte* is closely analogous to the reasoning here. There, a homebuilders association chal-

---

19. The majority states that "we cannot accept the County's argument that the APFO's VMP is 'voluntary.' " This conclusion is not supported by the record. The majority acknowledges that the county ordinance provides alternative conditions on development should a developer refuse to pay the VMP. Though the majority casts these situations as rare—"the record indicates that only a few developments have been approved upon complying with these alternative conditions"—the fact that any developments at all have been approved without VMPs shows that the VMPs are, in fact, voluntary. The majority's determination that the fee is not voluntary is not supported by the language of the ordinance, nor is it supported by the record.

lenged the city's imposition of user fees for certain regulatory services and access to public facilities on grounds that no statute expressly authorized those specific fees. The plaintiff bolstered its argument by pointing to the express inclusion of certain fees for sewer usage as evidence that other user fees were not authorized. The Court in *Homebuilders Ass'n* rejected that analysis:

> [T]he Court of Appeals noted that the General Assembly has expressly authorized county water and sewer districts to charge user fees for furnished services while it has remained silent on the authority to impose user fees for other services. Here again, *the General Assembly did not specify that sewer services were the only services for which user fees could be charged and we find no basis for such a strained reading of this statute.*

336 N.C. at 45, 442 S.E.2d at 51 (emphasis added) (internal citations omitted). That final statement applies equally well to this case: nowhere in Chapter 153A does the General Assembly forbid counties from accepting voluntary contributions or fees-in-lieu from developers in exchange for expedited development rights, much less from delaying or phasing development to achieve a legitimate policy goal. Rather, the General Assembly expressly and broadly authorizes counties to regulate and restrict development for the purpose of ensuring adequate schools, which is exactly what this APFO does.

It should be noted at this point that, despite the majority's juxtaposition of the two ("[I]t is clear that the VMP operates much like the mandatory school impact fee that the Court of Appeals invalidated in *Durham Land Owners Ass'n v. County of Durham.*"), Cabarrus County's APFO is significantly different from the school impact fee ordinance struck down by the Court of Appeals in *Durham Land Owners.* Under the Durham ordinance builders had to pay a mandatory fee for every dwelling unit built. The fee was required irrespective of existing school capacity, location of the development, or the county's future school construction plans. There was no requirement that the fees be spent to build a school in the area of the development, so future residents of the development might not even see the benefit of the fees paid by the developer. By contrast, Cabarrus County's APFO is carefully crafted and narrowly tailored, and payment can be avoided. Cabarrus County engages in an individualized school adequacy review for each proposed development based on the specific high school feeder area in which the development would be built. The review is based on hard data and mathematical formulae

that show the expected impact of the development, to the precision of fractions of a pupil, as well as the per-pupil cost of new capital facilities. Only if the capacity of the specific high school feeder area is inadequate for the development is any action taken at all. And even then, the developer has choices: delay development, phase development, modify the development plan, *or* make a mitigation payment to offset school impact. All the mitigation measures in the ordinance are geared toward providing school facilities that will accommodate the specific demand generated by the proposed development, not school needs countywide. The two cases are quite different, and our views of the mandatory Durham school impact fees should not influence our analysis of Cabarrus County's finely tuned, research-based regulatory scheme.

## IV. Session Law 2004-39

Even if the Court is unconvinced that the broad construction provisions of sections 153A-4 and 153A-124 apply and lead us to uphold the voluntary mitigation measures, the Court should still approve the entire APFO based on the additional grant of power contained in Session Law 2004-39. While it is arguable whether the session law provides authority to *adopt* the APFO,[20] it undoubtedly authorizes the *enforcement* of the APFO: "[T]he county of Cabarrus . . . may *enforce* . . . any provision of the school adequacy review performed under the Cabarrus County Subdivision Regulations, *including approval of a method* to address any inadequacy that may be identified as part of that review." Act of June 30, 2004, Ch. 39, Sec. 5, 2004 N.C. Sess. Laws 42, 47 (emphases added). The key language in the bill is the phrase "including approval of a method to address any inadequacy." This is another broad grant of power by the General Assembly. If Cabarrus County has authority to engage in the APFO's school adequacy review without VMPs—and as described in Section III.A it clearly does—then Session Law 2004-39 becomes the special legislation needed to support the VMP provision. Voluntary mitigation payments, as well as the other optional mitigation measures, are, without doubt, "method[s] to address any inadequacy" revealed by the school adequacy review.

The majority suggests that the session law did not authorize the adoption of an APFO. This conclusion ignores the fact that Cabarrus County had already adopted an APFO—without the VMP provision—

---

20. Though the majority does not reach the issue, I would agree with the plaintiffs that the session law does not give the County authority to act within municipalities without their permission.

pursuant to the statutory authority described in detail above. Only the VMP provision added after the session law raises any questions about statutory authority, as the APFO in effect at the time of the session law did not have such a provision. The session law clearly authorizes enforcement of the school adequacy review described in the preexisting, statutorily authorized APFO. But more importantly, the session law authorizes "approval of a method to address any inadequacy that may be identified as part of that review." *Id.* This clause, in the context of enforcing an APFO, indicates the legislature's awareness that future action might need to be taken; I see no functional distinction between "approval" and adopting, by a vote to approve, a method to address school inadequacy. Whatever the label, the session law specifically authorized Cabarrus County to create a method of addressing any inadequacy in school capacity it found during review. The VMP provision is exactly that: a method to address inadequacies identified in the school adequacy review. The General Assembly unequivocally authorized Cabarrus County to approve such a method through Session Law 2004-39.

Thus, even absent general statutory authority for the voluntary mitigation measures, Cabarrus County had authority under Session Law 2004-39 to modify its existing APFO by approving a method— voluntary mitigation payments—to address inadequacies revealed by school reviews.

## V. Conclusion

The majority's opinion minimizes the expansive powers that the General Assembly has given counties to oversee and control development and school construction. The opinion overlooks the clear language of the General Statutes in Chapter 153A, and misreads the broad enabling language of Session Law 2004-39. Finally, the majority opinion ignores the increasingly desperate situation of many county governments in North Carolina, which are faced with rising populations, diminishing state funding for schools, and already burdensome property taxes. These county governments will be, by the majority's opinion, deprived of an innovative but statutorily authorized tool to help meet their constitutional obligations regarding education. In my view, a carefully crafted ordinance like this one before us is exactly the kind of creative regulation of growth to keep pace with school capacity that the General Assembly intended. Therefore, I respectfully dissent.

Justice TIMMONS-GOODSON joins in this dissenting opinion.