IN THE SUPREME COURT OF NORTH CAROLINA

No. 101PA24

Filed 22 May 2026

GERALD COSTANZO, BRYAN DAGGOT, JOHN DUMBLETON, PHILIP SCHNEIDER, CLARA SCHNEIDER, MARGARET BINNS, MOHAN NADKARNI, GREGORY A. WANDER, RONALD BUCHANAN, STACEY MCCONNELL, GARY S. MILLER, JEFFREY P. FUSSNER, WILLIAM T. COLLINS, REX LUZADER, ELIZABETH SCHWEPPE, GERRILEA ADAMS, RICHARD J. CHOWN, PATRICIA C. CHOWN, GARY GOSNELL, MARY MAGNER, MICHAEL C. BRIGATI, ROBERT RICHARDSON, MARYANN DUMBLETON, and COROLLA CIVIC ASSOCIATION

v.

CURRITUCK COUNTY, NORTH CAROLINA; THE CURRITUCK COUNTY TOURISM DEVELOPMENT AUTHORITY; THE CURRITUCK COUNTY BOARD OF COMMISSIONERS; and DANIEL F. SCANLON II, CURRITUCK COUNTY MANAGER and BUDGET OFFICER, both in his official capacity and in his individual capacity

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 293 N.C. App. 15 (2024), reversing in part and vacating in part an order entered on 28 December 2021 by Judge Wayland J. Sermons, Jr. in Superior Court, Currituck County. Heard in the Supreme Court on 17 February 2026.

*Dowling PLLC, by Troy D. Shelton, for plaintiff-appellees.*

*Womble Bond Dickinson (US) LLP, by Christopher J. Geis, for defendant-appellants.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P., by J. Mitchell Armbruster & Dana E. Simpson, for North Carolina Travel and Tourism Coalition, North Carolina Restaurant and Lodging Association, North Carolina Hospitality Alliance, North Carolina Vacation Rental Managers Association, and Vacation Rental Managers Association, amici curiae.*

EARLS, Justice.

The legislature enables some counties and municipalities to exact an occupancy tax, or a tax on the proceeds of room or lodging rentals. These enabling statutes typically also limit how the resulting revenues can be spent. In Currituck County, occupancy tax revenues may only be spent on "promot[ing] travel and tourism" as well as "tourism-related expenditures." *See* An Act to Allow an Increase in the Currituck County Occupancy Tax and to Change the Purposes for Which the Tax May Be Used, S.L. 2004-95, § 2, 2003 N.C. Sess. Laws (Reg. Sess. 2004) 115, 115–16 [hereinafter Act of 2004]. The latter is defined as those expenditures that, "in the judgment of the Currituck County Board of Commissioners, are designed to increase the use of" various county facilities "by attracting tourists or business travelers to the county." *Id.* at 116.

Defendant Currituck County, through its Board of Commissioners, decided to spend occupancy tax revenues on certain public safety services—including law enforcement, emergency medical services, and fire response, predominately tied to the heavily touristed beach destination of Corolla along the northern Outer Banks. In the Commission's view, these expenditures are tourism-related because Currituck County's population doubles during peak season and the County incurs substantial year-round costs to provide adequate public safety services during that period. The Commissioners believe that tourists and business travelers visit the County because it has a reputation for being safe and family-friendly and that tourists would be

deterred from visiting the County if it were unable to provide sufficient police, fire, and emergency response services to protect them during their visit.

Plaintiffs, property owners in Currituck County as well as a civic association containing other such property owners, challenge that decision. In their view, because public safety services are not a literal tourist attraction, the County is not authorized to spend occupancy tax revenue on such services. They sought a declaratory judgment to that effect and an injunction prohibiting the County from making such expenditures.

The legal issue presented is whether the Commissioners reasonably determined that these expenditures are tourism-related. The trial court determined that they did relate to tourism and granted summary judgment to the County on this claim. After the property owners appealed, the Court of Appeals reversed the lower court and ruled in favor for the property owners.

On discretionary review, we conclude that Currituck County's occupancy tax statute does not prohibit the County from spending revenues on enhanced public safety services related to area tourism. The County could—and here, did— reasonably conclude that the challenged public safety spending is tourism-related because tourists are not likely to visit Currituck if they believe it is unsafe and because substantial tourism-related population changes greatly increase the demand for public safety services in the area and at a year-round cost. We therefore reverse the decision of the Court of Appeals and remand this matter for further remand to

the trial court to enter summary judgment for the County on this claim and for further proceedings on the remaining claims consistent with this opinion.

Protecting public safety is among the most important responsibilities North Carolinians entrust to their democratically elected officials. Doing so while promoting economic growth and fairly allocating the tax burden across the community is an ongoing challenge for many elected officials. Here the legislature vested the County, through its Commissioners, with the responsibility to decide how to spend limited occupancy tax funds to attract tourists to their area. The County did not abuse its discretion under the statutes by concluding that adequate public safety services related to robust area tourism are appropriate uses of these funds.

## I.    Background

### A. The Legislature Enables Currituck County to Enact an Occupancy Tax

Through a series of local acts, the legislature enables more than two hundred counties and municipalities to exact a room occupancy tax. *See generally* N.C. Gen. Assembly, *Occupancy Tax Overview: Updated Through 2024 Regular Session*, https://webservices.ncleg.gov/ViewDocSiteFile/56369 (last visited May 11, 2026). These local acts follow a common structure: the statutes set a maximum tax rate, ranging from one percent to eight percent. *E.g.*, An Act Relating to NASCAR Hall of Fame Financing, S.L. 2005-68, § 1, 2005 N.C. Sess. Laws 106, 107. They also define how revenues may be allocated. Authorized uses are as narrow as a particular museum, *see id.*, or as broad as "any public purpose," *e.g.*, An Act to Authorize Cleveland County

to Levy a Room Occupancy and Tourism Development Tax, ch. 173, § 1(e), 1989 N.C. Sess. Laws 391, 393. The statutes also designate a governing board tasked with spending the occupancy tax revenues. *E.g.*, An Act to Authorize Franklin County and the Cities of Eden and Reidsville to Levy a Room Occupancy and Tourism Development Tax and to Amend the Durham and Rockingham Occupancy Taxes, S.L. 2005-233, pt. I, § 1.2, 2005 N.C. Sess. Laws 544, 544–45 (authorizing, *inter alia*, the Franklin County Board of Commissioners to appoint members to the Tourism Development Authority and requiring that those members include individuals affiliated with businesses that collect occupancy tax revenues and individuals who are currently active in promoting tourism); An Act . . . Modifying the Method of Appointment of Members and Officers to Certain Local Tourism Development Boards . . . , ch. 540, pt. II, § 4, 1995 N.C. Sess. Laws 2009, 2012–13 (modifying, *inter alia*, Haywood County's Tourism Development Authority membership to consist of three persons who own or operate "hotels, motels, or other accommodations" greater than twenty units, three persons operating facilities with less than twenty units, and three "tourist-oriented" business members).

Although these statutes have some commonalities, the details of each tax system vary significantly. For example, sometimes the relevant governing board is a Tourism Development Authority (TDA), which could include representatives from specific industry groups like the local Chamber of Commerce, Board of Realtors, or Hospitality Association. *E.g.*, An Act to Repeal the Carteret County Occupancy Tax

Law and to Authorize Carteret County to Levy a New Occupancy and Tourism Development Tax, S.L. 2001-381, § 8(b), 2001 N.C. Sess. Laws 1242, 1249–50 [hereinafter Act of 2001]. Other times, the governing body is composed exclusively of independently elected local government officials. *E.g.*, An Act to Authorize Davie County to Levy a Room Occupancy and Tourism Development Tax, ch. 928, § 1, 1989 N.C. Sess. Laws 276, 277–78 (vesting "Davie County" with authority to use and distribute the occupancy tax revenues).

The revenue allocation restrictions vary too. Some occupancy tax revenues are limited to "promot[ing] travel and tourism" and "tourism-related expenditures." *E.g.*, An Act to Authorize the Town of Franklin to Levy a Room Occupancy and Tourism Development Tax, S.L. 2004-105, § 1(c), 2003 N.C. Sess. Laws (Reg. Sess. 2004) 129, 129. Others are allocated to municipalities within the county or for specific purposes such as "beach nourishment." *E.g.*, An Act to Authorize Dare County to Levy an Occupancy Tax, ch. 449, § 1(e), 1985 N.C. Sess. Laws 380, 381–82; An Act . . . to Authorize Dare County to Levy an Additional One Percent Occupancy Tax . . ., S.L. 2010-78, § 7, 2009 N.C. Sess. Laws (Reg. Sess. 2010) 320, 325. This variation underscores that the particular language the legislature used in each statute is important and that the legislature did not intend a "one-size-fits-all" approach to boosting tourism throughout the state.

Relevant here, one occupancy tax statute covers North Carolina's northeastern most county of Currituck. The county runs from the mainland to the northern Outer

Banks barrier islands. It has approximately 28,100 year-round residents, including 1,159 full-time residents on Corolla. In the summer, tourists cause Currituck's population to double to around 60,000, most of whom stay on Corolla. These tourists book hotels or motels, or rent vacation homes or other lodgings, at costs reaching up to thousands to tens of thousands of dollars a week in peak summer months. Tourists engage in a variety of activities, from visiting the beach, eating at restaurants, observing wild horses, playing a round of golf, or exploring neighboring areas. The number of tourists visiting the county has increased nearly every year.

The occupancy tax statute enables Currituck County's Board of Commissioners to levy up to a six percent tax on lodging and similar accommodation rentals. *See* An Act to Authorize Currituck County to Levy a Room Occupancy and Tourism Development Tax, ch. 209, § 1, 1987 N.C. Sess. Laws 277, 277 [hereinafter Act of 1987]; An Act to Authorize Currituck County to Levy an Additional One Percent Occupancy Tax and to Use the Proceeds of the Additional Tax for the Currituck Wildlife Museum, ch. 155, § 1, 1991 N.C. Sess. Laws 269, 269; Act of 2004, § 1, 2003 N.C. Sess. Laws (Reg. Sess. 2004) at 115. But should the County choose to levy a tax, the first three percent of such revenues may only be used on "tourism-related expenditures, including beach nourishment." Act of 1987, § 1(a), 1987 N.C. Sess. Laws at 277; Act of 2004, § 2, 2003 N.C. Sess. Laws (Reg. Sess. 2004) at 115. Two-thirds of the next three percent of the tax proceeds must be spent "to promote travel and tourism." Act of 2004, § 2, 2003 N.C. Sess. Laws (Reg. Sess. 2004) at 115–16. The

remainder of that next three percent must also go to "tourism-related expenditures." *Id.* In all then, two-thirds of the occupancy tax proceeds must be spent on tourism-related expenditures and one-third must be spent on promoting travel and tourism.

The statute further defines these categories of expenditures. "[P]romoting travel and tourism" is defined narrowly as "advertis[ing] or market[ing] an area or activity, publish[ing] and distribut[ing] pamphlets and other materials, conduct[ing] market research, or engag[ing] in similar promotional activities that attract tourists or business travelers to the area." *Id.* at 116. A "[t]ourism-related expenditure" is, in turn, defined as "[e]xpenditures that, in the judgment of the Currituck County Board of Commissioners, are designed to increase the use of lodging facilities, meeting facilities, recreational facilities, and convention facilities in a county by attracting tourists or business travelers to the county." *Id.* The category specifically "includes tourism-related capital expenditures and beach nourishment." *Id.*

The statute also required that the county, when levying the tax, create a "Tourism Development Authority." *Id.* § 3 at 116. That body is charged with promoting travel and tourism to the county and with "expend[ing] the net proceeds of the tax levied under this act for the purposes provided in Section 1 of this act." *Id.* at 117. In turn, the voting members of the Currituck County TDA are the County Commissioners, and the nonvoting member is the county's designated ex officio "travel and tourism representative." *Id.*; *see also* An Act to Increase the Membership of the Currituck County Tourism Development Authority from Six to Eight Members,

S.L. 2008-54, § 1 2007 N.C. Sess. Laws (Reg. Sess. 2008) 98, 98 (expanding the size of Currituck's TDA when the county expanded to seven commissioners). By separate statute, commissioners are elected by the entire county and are responsible for acting for and on behalf of the county. N.C.G.S. §§ 153A-11, -12 (2025); An Act to Amend Chapter 652, Session Laws of 1949, Relating to the Nomination and Election of Members of the Currituck County Board of Commissioners so as to Provide that the District Candidates Shall Be Elected By a Vote of the People of the County as a Whole, ch. 706, §§ 1–2, 1961 N.C. Sess. Laws 893, 893. Thus, the County Commissioners, sitting as the TDA, are responsible for allocating the occupancy tax revenues consistent with the statute's enumerated purposes and with boosting tourism to the area.

## B. Property Owners Challenge Currituck County's Occupancy Tax Expenditures

For several annual budget cycles, the County, through the Board of Commissioners, has expended occupancy tax revenues on various public safety services. These costs included law enforcement personnel and equipment, emergency medical services personnel, a paid fire district (instead of an all-volunteer fire response service), beach lifeguards, and repairing and maintaining coastal roads. Most expenditures are targeted to the County's most popular tourist destination of Corolla. The Commissioners voted to make such expenditures after public budget workshops, where they discussed the details of the budget items, and upon recommendation of officials like the county manager and local sheriff.

Plaintiffs are property owners who collect and remit occupancy tax proceeds to Currituck County and a civic association whose members include other such property owners (collectively, the property owners). On 7 May 2019, they brought an action for declaratory judgment against the County, the county's Tourism Development Authority, the Board of Commissioners, and the county manager. The property owners claimed that occupancy tax funds were improperly allocated to the county's general fund, that the funds were unlawfully used for public safety services and equipment, and that the funds were unlawfully used for general economic development and other nonqualifying projects, as well as loans for construction of a water treatment facility and to fund special service districts. Their complaint also alleged a constitutional violation based on the same theories. In addition to a declaratory judgment, the property owners sought injunctive relief to prohibit the County from using occupancy tax proceeds for unlawful purposes and to require the County to return improperly transferred funds to the TDA. The property owners also requested that the court issue "standards" that would constrain the Board's "judgment" when spending tax proceeds.

Later, on defendants' Rule 12(b)(6) motion, the trial court dismissed the property owners' constitutional claim and dismissed the Currituck County Board of Commissioners and county manager as defendants. The remaining defendants were the County itself and the TDA (together, the County). After discovery, on 24 June 2021, the property owners moved for partial summary judgment as to their second

claim, that the statute bars the County from using occupancy tax proceeds for public safety services and equipment. On 19 November 2021, the County cross-motioned for summary judgment on all of the property owners' claims. In so moving, both sides agreed that there are no genuine issues of material fact.

The trial court ultimately denied the property owners' partial motion for summary judgment on their second claim and granted summary judgment for the County on all claims. The property owners timely appealed.

## C. The Court of Appeals Decision

On direct appeal, the Court of Appeals reversed the trial court's denial of partial summary judgment for plaintiffs and would have remanded the matter for entry of partial summary judgment in favor of the property owners. *See Costanzo v. Currituck County*, 293 N.C. App. 15, 24–25 (2024). The court also vacated the trial court's grant of summary judgment for the County on all remaining claims. *Id.* at 25. The Court of Appeals majority opinion concluded that public safety expenditures like police protection and emergency services were not authorized expenditures under Currituck's occupancy tax statute, based on the statute's history. *Id.* Specifically, the Court of Appeals observed that an earlier version of the occupancy tax statute defined "tourist related purposes" for which funds may be used as including "police protection[ ] and emergency services." *Id.* at 16–19 (quoting Act of 1987, § 1(e), 1987 N.C. Sess. Laws at 279). A later amendment removed those two items. *Id.* The court reasoned that, by removing these more specific mentions of occupancy tax uses, the

legislature intended to narrow the approved uses of occupancy tax proceeds and implicitly bar the County from spending funds on law enforcement and EMS. *Id.* at 21–22. Thus, the Court of Appeals concluded that the County lacked discretion to spend the funds on those services.

Judge Hampson concurred in a separate opinion. Although he concluded that the statute does permit general public safety services to qualify as "tourism-related expenditures," in his view, the County failed to exercise its judgment consistent with the statute because the Board of Commissioners never made a finding on the record that the expenditures on public safety services were related to tourism. *Id.* at 25 (Hampson, J., concurring). He interpreted the record to mean that the County was simply disbursing the occupancy tax revenues from the TDA fund to the county's general fund without ever "exercising its judgment to determine it was expending those funds for tourism-related activities." *Id.* at 26. This "misapprehension of the law," Judge Hampson concluded, was an abuse of discretion and grounds to deny the County's motion for summary judgment on this claim. *Id.*

The County sought discretionary review from this Court, which we allowed on 25 June 2025. The petition for discretionary review presented two issues, namely, whether local government officials have discretion to determine that spending on public safety services is necessary to attract tourists to their county and what standard of review applies to that determination. We now reverse the decision of the Court of Appeals.

## II.   Analysis

### A. Legal Standard

A county is an agency of the State and thus is subject to the powers, "express and implied, [that] are conferred [on it] by statutes." *Lanvale Props., LLC v. County of Cabarrus*, 366 N.C. 142, 150 (2012) (quoting *Martin v. Bd. of Comm'rs*, 208 N.C. 354, 365 (1935)). In particular, when the legislature authorizes a county to exact a tax, the county may only exercise that taxing power within statutory limits. *See Stam v. State*, 302 N.C. 357, 360 (1981). The meaning and scope of a statute is a question of law reviewed de novo. *See Cohane v. Home Missioners of Am.*, 387 N.C. 1, 7 (2025).

The "principal goal of statutory construction is to accomplish the legislative intent," and the General Assembly's intent "may be found first from the plain language of the statute." *Beavers v. McMican*, 385 N.C. 629, 634 (2024) (cleaned up); *see also Quality Built Homes Inc. v. Town of Carthage*, 369 N.C. 15, 19 (2016) (noting that we first turn to the "plain language of the enabling statute" to "determin[e] the extent of legislative power conferred upon a municipality"), *superseded by statute on other grounds*, N.C.G.S. § 160A-314(a) (2017). When interpreting a municipal enabling statute, we "presume that the legislature acted with care and deliberation," *Bowers v. City of High Point*, 339 N.C. 413, 420 (1994), and we consider the scope of a particular enabling act in context of the broader municipal regulatory scheme, *see Lanvale Props.*, 366 N.C. at 156. Where a statute clearly and unambiguously authorizes a locality to act, the statute must be given "its plain and definite meaning."

*Id.* at 154 (quoting *Smith Chapel Baptist Church v. City of Durham*, 350 N.C. 805, 811 (1999)); *accord Durham Land Owners Ass'n v. County of Durham*, 177 N.C. App. 629, 634 ("[W]here the plain meaning of the statute is without ambiguity, it 'must be enforced as written.'" (quoting *Bowers*, 339 N.C. at 419–20, *quoted in Bellsouth Telecomms., Inc. v. City of Laurinburg*, 168 N.C. App. 75, 82–83 (2005))), *disc. rev. denied*, 360 N.C. 532 (2006).

Moreover, even when local officials act within the discretion afforded to them by statute, they still cannot act in bad faith, in an arbitrary or capricious manner, or in disregard of the law. *Pue v. Hood*, 222 N.C. 310, 315 (1942). A bad faith act may be one made in "wanton disregard of public good" or with intent to "squander public funds." *Barbour v. Carteret County*, 255 N.C. 177, 181–82 (1961). An arbitrary or capricious act is one "done without adequate determining principle" or "without reason, in a whimsical manner, implying either a lack of understanding of or a disregard for the surrounding facts and settled controlling principles." *In re Hous. Auth.*, 235 N.C. 463, 468 (1952) (cleaned up). Arbitrary and capricious actions are not necessarily made in bad faith but in the context of a discretionary act, do "ordinarily denote abuse of discretion." *Id.* The burden is on the complaining party to show that the public officials have failed to act "in good faith and in accord with the spirit and purpose of" the law. *See Painter v. Wake Cnty. Bd. of Educ.*, 288 N.C. 165, 178 (1975). "[T]he courts will not hesitate to afford prompt and adequate relief" where an officer abuses their discretion in this manner and thereby impairs "personal or property

rights." *Pue*, 222 N.C. at 315.[1]

When, however, local officials act within these guardrails, courts should not second-guess their decisions. Specifically, we will not pass on the wisdom of otherwise lawful actions by local officials, including such actions by democratically elected county commissioners. *Barbour*, 255 N.C. at 181. Within our constitutional structure, "[c]ourts cannot substitute their judgment for that of the county officials honestly and fairly exercised." *Id.*

## B. Application

### 1. *The Statutory Scope of Discretion*

The first issue is whether Currituck County's occupancy tax statute categorically bars the County from spending revenues on general public safety services that are tied to area tourism. That is, did the County have discretion under the statute to make these allocations?

Our analysis begins with the plain language of the relevant enabling statute

---

[1] For clarity, note that arbitrary and capricious review is not the same as hypothetical rational basis review, the doctrine that applies to federal substantive due process challenges to economic regulations among other things. The two are conceptually distinct. For example, a regulation that prohibits an optician from fitting lenses to a face without a prescription from an ophthalmologist or optometrist can survive hypothetical rational basis review because courts can conceive of a reason the regulation is rationally related to a legitimate government purpose. *See Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483, 486, 487–88 (1955). But if the same regulation is the product of a coin-flip, it cannot be said to be the result of reasoned decision making and would be vulnerable to challenge as arbitrary and capricious. *E.g.*, *In re Hous. Auth.*, 235 N.C. at 469–70 (concluding that evidence at trial was sufficient to support a jury verdict that Housing Commissioners acted arbitrarily or capriciously when they failed to consider the negative consequences of exercising eminent domain over one location and failed to consider other alternatives to accomplish the same public benefits with fewer harmful effects).

and specifically its limits on how the tax revenues can be used. *See Quality Built Homes Inc.*, 369 N.C. at 19. The statute creates two categories of allowed expenditures: those that "promote travel and tourism" and those that are "tourism-related." Act of 2004, § 2, 2003 N.C. Sess. Laws (Reg. Sess. 2004) at 115–16. "Tourism-related expenditures" are, in turn, those that "in the judgment of the Currituck County Board of Commissioners" will increase facilities use "by attracting tourists or business travelers to the county." *Id.* at 116.

The word "judgment" appears to authorize Commissioners to use some measure of their own opinion or assessment. *See, e.g.*, *Judgment*, Webster's Third New International Dictionary 1223 (2002) (defining "judgment" as "the action of judging," or "the mental or intellectual process of forming an opinion or evaluation by discerning and comparing"); *Perkins v. Ark. Trucking Servs., Inc.*, 351 N.C. 634, 638 (2000) ("[C]ourts may look to dictionaries to determine the ordinary meaning of words within a statute."). An exercise of judgment can involve "mentally establishing a relation between two or more terms." *Judgment*, Webster's Third New International Dictionary at 1223. The statute also sets the purpose for which that judgment must be exercised: "to attract tourists or business travelers" in a manner that will "increase the use of lodging facilities, meeting facilities, recreational facilities, and convention facilities in a county." Act of 2004, § 2, 2003 N.C. Sess. Laws (Reg. Sess. 2004) at 116. So, in an ordinary meaning sense, the statute vests decision-making authority in a specific body—the Board of Commissioners—and sets the purpose for which the

Board must exercise that judgment—attracting tourists. The legislature tasked the Commissioners specifically with discerning the relationship between the expenditures and the attraction of tourists.

The Commissioners' essential decision-making role is underscored by other parts of the same statute. *See Burgess v. Your House of Raleigh, Inc.*, 326 N.C. 205, 215 (1990) (noting that statutory words and phrases must be interpreted in context). The statute charges the TDA with expending occupancy tax revenues, and it specifies that the voting members of the TDA are the County Commissioners. Act of 2004, § 3, 2003 N.C. Sess. Laws (Reg. Sess. 2004) at 116–17. Thus the TDA and the County Commissioners are the same. This structure appears to be fairly unusual among occupancy tax statutes. Other occupancy tax statutes vest decision-making authority in bodies composed of representatives from specific business industries or a variety of local officials. *E.g.*, Act of 2001, § 8(b), 2001 N.C. Sess. Laws at 1249–50; An Act . . . to Alter the Composition of the Dare County Tourism Board, S.L. 2002-141, § 9, 2001 N.C. Sess. Laws (Reg. Sess. 2002) 552, 554–55 (requiring Dare County's TDA to consist of six board members from specific towns, one county commissioner, and representatives from local industry groups and the county at large).

That local TDAs contain different types of members across occupancy tax statutes strongly suggests that the legislature deliberately chose the composition of those bodies and intended for designated representatives to bring their

distinctive perspectives to bear on what will attract tourists in that area. *See Bowers*, 339 N.C. at 420 ("[We] presume that the legislature acted with care and deliberation."); *Lanvale Props.*, 366 N.C. at 156 (interpreting the scope of a municipality's power within the context of other municipal enabling statutes). And practically speaking, the Commission is well positioned to make a reasoned decision on this matter because the Currituck County Board of Commissioners is elected by the entire county and is responsible for acting for and on behalf of the county. As the record shows, Commissioners have historically had personal experience with area tourism and are deeply familiar with the community they serve. This comparison with other occupancy tax statutes thus further supports that the legislature intended to vest the Commissioners, sitting as the TDA, with limited discretion to decide which expenditures will attract tourists to Currituck County.

As to what qualifies as a "tourism-related expenditure[ ]," the statute lists two examples: "capital expenditures and beach nourishment." Act of 2004 § 2, 2003 N.C. Sess. Laws (Reg. Sess. 2004) at 116. The term "beach nourishment" is defined in detail in the statute. *Id.*[2] But "capital expenditures" are not defined. Nor does this list

---

[2] "Beach nourishment" is defined as: "The placement of sand, from other sand sources, on a beach or dune by mechanical means and other associated activities that are in conformity with the North Carolina Coastal Management Program along the shorelines of the Atlantic Ocean of North Carolina and connecting inlets for the purpose of widening the beach to benefit public recreational use and mitigating damage and erosion from storms to inland property." Act of 2004, § 2, 2003 N.C. Sess. Laws (Reg. Sess. 2004) at 116. The term also includes costs associated with qualifying for state or federal projects, planting vegetation, and providing enhanced public beach access. *Id.*

appear to be exclusive: the definitional provision "includes" those examples but is not expressly limited to them. In fact, the statute does not expressly forbid any types of expenditures. *See id.* There is little indication in this language that the legislature intended to categorically prohibit certain types of expenditures that Commissioners otherwise judge will attract tourists to a given area.

The property owners take a different view of this definitional provision. They argue that the definition of "tourism-related expenditures" encompasses only literal tourist attractions, such as Beaufort's pirate invasion weekend, Morehead City's Big Rock fishing tournament, Kitty Hawk's aviation history museum, and Carolina Beach's beach music festival. But the challenge with this interpretation is that the legislature knew how to explicitly and closely limit occupancy tax revenues to particular uses—and indeed did so in other parts of the statute. For example, the one-third category for "promoting travel and tourism" authorizes spending only on advertising, marketing, pamphlet distribution, and "similar promotional activities that attract tourists," etc. *See id.* The "beach nourishment" component of a "tourism-related expenditure" is similarly defined in great detail. *Id.* The legislature could have likewise provided in detail that "tourism-related expenditures" are "festivals, competitions, and similar tourist attractions." Instead, the legislature opted for a more open-ended definition—that the designated decision makers use their judgment to discern which expenditures will increase facilities uses by attracting tourists. We generally presume the legislature's choice of words was purposeful and we thus

should interpret the statute in a manner that gives effect to all of its provisions. *See State v. Coffey*, 336 N.C. 412, 417–18 (1994). Applying that principle here, we should presume that the legislature purposefully balanced the narrower, delineated list of expenditures in one category with the less precisely defined, discretion-based standard in the other category. That might make practical sense to the extent it introduced flexibility for local experts to assess the needs and opportunities for developing tourism in their area. Such expenditures may include festivals and competitions, consistent with the property owners' view, but the statute does not limit the County to only those types of tourism-related expenditures.

The property owners, like the Court of Appeals majority, further invoke statutory history. *See Costanzo*, 293 N.C. App. at 21, 25.[3] They point out that Currituck's 1987 occupancy tax statute specifically authorized tax proceeds to be spent on "tourist related purposes, including construction and maintenance of public facilities and buildings, garbage, refuse, and solid waste collection and disposal, *police protection, and emergency services.*" Act of 1987 § 1(e), 1987 N.C. Sess. Laws at 279 (emphasis added). The 2004 amendments omitted this particular list of approved uses and replaced it with the "judgment"-based definition. *See* Act of 2004 § 2, 2003 N.C.

---

[3] For clarity, by "statutory history," we mean the development of a statute over time via amendments and earlier enactments, for example. That source of statutory interpretation is distinct from legislative history, or evidence of deliberations or intentions from the legislative process such as remarks from floor debates or committee reports. *See generally* Anita S. Krishnakumar, *Statutory History*, 108 Va. L. Rev. 263, 265–66 (2022); *Hanson v. Charlotte-Mecklenburg Bd. of Educ.*, 387 N.C. 445, 445–46 (2025) (Newby, C.J., concurring).

Sess. Laws (Reg. Sess. 2004) at 115–16. The property owners thus argue that, by deleting "police protection[ ]and emergency services," the legislature intended to forbid occupancy taxes from being used on those services. Further support for this conclusion, the property owners argue, is found in the title of the 2004 session law amendments: "An Act to Allow an Increase in the Currituck County Occupancy Tax and to Change the Purposes for Which the Tax May Be Used." *See also Costanzo*, 293 N.C. App. at 21.

This reasoning is unpersuasive. As a general matter, where the language of the statute is clear, it "is determinative and forecloses reference to other interpretive tools." *State v. Borum*, 384 N.C. 118, 125 (2023). That is, we should generally not draw inferences based on suspicions about what the legislature really meant by certain amendments where those inferences contradict the current statute's plain language. But even looking at statutory history, it is difficult to agree with the Court of Appeals that by omitting a particular list of "tourist related purposes," the legislature intended to deauthorize those as "tourism-related expenditures."

Namely, in 2004, the legislature amended the statute to omit *all* of the illustrative examples in subsection 1(e) of the 1987 statute, not just some of them. Generally speaking, examples in a statute can operate to "limit the scope of words that might otherwise be subject to wider interpretation." *Happel v. Guilford Cnty. Bd. of Educ.*, 387 N.C. 186, 208 (2025); *id.* at 209 (discussing the *noscitur a sociis* canon of interpretation that "a word is better understood by considering the meanings

of neighboring words"); *Cooper v. Berger*, 371 N.C. 799, 810 (2018) (discussing the canon of *expressio unius est exclusio alterius* that "when a statute lists the situations to which it applies, it implies the exclusion of situations not contained in the list" (quoting *Evans v. Diaz*, 333 N.C. 774, 779–80 (1993))). By the same token, deleting examples can open the original term up to wider interpretation. Thus, the legislature's choice to omit a particular list of authorized expenditures and replace it with a different definition may represent its intent to omit the limiting function of the earlier examples.

Latin maxims aside, common sense helps us reach the same conclusion. If a person's spouse says, "We can go anywhere you want for lunch, including Cook Out or Bojangles," the person may reasonably conclude that that their spouse is not offering to go to the downtown steakhouse because it is not a fast-food restaurant. But if the following month, their spouse says, "Let's do lunch wherever you want downtown," the person may reasonably conclude that the steakhouse is fair game— as is any fast-food spot downtown. The purpose of eliminating certain examples depends on the context, including any other changes between the two statements.[4]

---

[4] The property owners relatedly argued that the legislature's choice to replace "tourist related purposes" with "tourism-related expenditures" represented "a major change in language" that "shows an intent to change the law and prohibit the future use of occupancy tax dollars on general public services to offset the costs of visiting tourists." This argument is similarly unavailing. Even if there are some contexts where using one or the other term would connote substantially different meanings, this context does not appear to be one of them. The two terms appear to serve functionally similar purposes of describing the objectives for which the funds may be used, which cuts against ascribing strong significance to the change in phrasing. *See Cohane*, 387 N.C. at 10 (noting that the presumption of

Finally, the 2004 session law's title is not to the contrary. The 2004 statute made other changes to Currituck's occupancy tax revenue laws consistent with its title. The 2004 revisions eliminated the County's ability to spend twenty-five percent of occupancy tax revenue on "any lawful purpose"—including costs that the County concedes it now believes are outside of the scope of "tourism-related expenditures" such as school textbooks or county administrative staff salaries. In addition to stripping the County of such carte blanche, the 2004 revisions further limited one-third of the expenditures to the more narrowly targeted "promot[ing] travel and tourism" category. Simply put, it is true that the 2004 amendments changed "the purposes for which the tax may be used" and did not also bar expenditures on public safety services impacted by heavy area tourism. The 2004 amendments need not have the significance the property owners ascribe in order that the statute's title make sense.

As a matter of statutory interpretation, then, we disagree with the property owners that Currituck's occupancy tax statute categorically bars the County from using its limited discretion to spend such tax revenues on public safety services tied to heavy area tourism.

## 2. *The County's Exercise of Its Limited Discretion*

Even where a statute affords local officials the discretion to act, those officials

---

consistent usage does not attach when two terms are effectively synonymous in context). In any event, the latter term has a different technical definition that controls. *See State v. Coker*, 312 N.C. 432, 435 (1984).

may not exercise that discretion in an arbitrary or capricious manner, in bad faith, or in disregard of the law. *See Pue*, 222 N.C. at 315; *Barbour*, 255 N.C. at 181–82; *In re Hous. Auth.*, 235 N.C. at 468. The second legal issue presented is whether the County appropriately exercised its discretion in this case.

Here the parties agree there are no genuine issues of material fact, and the record at summary judgment supports that the County did exercise its limited discretion consistent with the statute and in good faith. The County appeared to understand the relevant legal standard and reasonably determine that public safety services tied to heavy area tourism were appropriate expenditures to attract tourists.

First, the Commissioners seemed to have an adequate understanding of the statutory limitations on "tourism-related expenditures." For example, the Commissioners testified that the statute required them to decide, "in our opinion . . . or judgment," whether a cost is "tourism-related." They had to draw from their own experience and understanding to assess "what is needed to support tourism" and "what will entice [tourists] to come here." In the Commissioners' views, knowing how to entice tourists requires understanding "everything [the tourists] do and say and enjoy on vacation," including the variety of reasons tourists may visit the area and what will "enhance their experience" during their stay. The statute, they testified, requires some "correlation" between the expenditure and attracting tourism. One commissioner explained that "new textbooks" at the local high school would not qualify, because such an expenditure is "not an occupancy tax, travel and tourism

thing." Another explained that the statute's language is clear that the funds are "not designed for residents." A third elaborated that he recalled turning down "a request or a budget amendment" if the Commissioners were not satisfied it met "what we felt like was tourism-related." A fourth explained that the Commission had to use "our best judgment . . . to increase and to make Corolla, the mainland, Carova, Knotts Island, anywhere in the county a great place to visit and make them want to come back again."

The Commissioners also reasonably determined that the challenged public safety spending was related to tourism and would attract tourists. The Commissioners thought that enticing tourists required "providing a safe environment with ample resources" to support this population. Part of what attracts tourists to their area, the Commissioners believed, is that it is "family oriented" and that the beach area is "clean and safe" and worth the cost of renting a place to stay there during peak season. The Commissioners determined that tourists would not visit a place they believe is unsafe. As one commissioner put it, "[I]t just makes common sense that if we don't have fire protection, if we don't have police protection, people are not coming to an area that they don't feel is safe." She elaborated, "I wouldn't think people would come to Currituck County . . . if they felt like they were not going to be safe, that there was not adequate facilities here for them . . . if something were to happen." Another echoed this sentiment: "[Y]ou're not going to take your family . . . to a destination if it's not safe."

Existing services were also, in the Commissioners' view, insufficient to support the tourist population. Again, the County's 28,000 year-round population doubles to about 60,000 during tourist season when most tourists flock to Corolla. Commissioners testified that protecting the tourist population requires significantly more public safety personnel than the County would have otherwise. More people means a greater risk of accidents, drownings, heatstrokes, physical altercations, and other safety risks. As one commissioner put it, "[W]e have to have more [s]heriffs or EMS because of the influx of the tourists on our county." Per another, "The whole county is affected by the tourist season" for various reasons, including that tourists must travel through the mainland of the County to reach the beach. The Commissioners based their judgment on their own experiences in the tourism industry and on input and data from other local officials, including county professionals such as the tourism director and EMS departments as well as the independently elected sheriff. As with beach lifeguards, EMS services ready to respond to life-saving ocean rescues, paid fire responders, and sheriff's deputies all contribute to keeping beaches and vacationers safe and attract tourists to the Currituck area, the Commissioners explained. Recognizing that communities must be safe for tourists to want to visit and return can hardly be said to be whimsical or lacking in understanding of surrounding facts or controlling principles. *See In re Hous. Auth.*, 235 N.C. at 468. Indeed, the Commissioners seemed to approach their application of discretion under the statute with a healthy dose of common sense.

The Commissioners further judged that, even though tourists mainly flock to Currituck from early spring to the middle of fall, "it is not practical to hire, train, and pay [the necessary personnel] for only half the year," particularly for important and skilled jobs like law enforcement and medical services. The County thus incurs year-round costs to protect public safety during peak season. Striving to hire competent people to do important jobs to keep people safe, within the practical realities of the employment market, is certainly not unreasonable, arbitrary, capricious, or an act of bad faith.

These mid-litigation justifications are consistent with contemporaneous evidence of the County's decision making. The property owners' own evidence cited the county manager's remarks at the County's annual budget presentations. Those remarks indicated that EMS and law enforcement received occupancy tax funds because of "summer traffic," the "influx of population" during the "summer season," and the "up-tick [in] population." Evidence showed that at least once during discussions, Commissioners expressed concerns with occupancy tax revenues covering sheriff's vehicles for off-road areas. But upon clarification that the vehicles were required for beach law enforcement—because traditional police cruisers like Dodge Chargers cannot safely maneuver across sandy beaches—the amendment was approved.

Moreover, these mid-litigation explanations were confirmed by how the funds were actually spent. Eighty percent of occupancy tax revenue was spent on Corolla,

the undisputed primary driver of area tourism. The occupancy tax funds went to law enforcement, EMS, fire protection, beach lifeguards, and repairing and maintaining coastal roads. Funds also went to tourist destinations like the Whalehead Club and Maritime Museum. Commissioners also apparently endeavored to diversify the County's tourism economy and spent occupancy tax revenues on mainland tourist attractions such as a veteran's park, the Historic Jarvisburg Colored School Museum, and upgrades to the local airport. In summary, the Commissioners' later testimony is consistent with contemporaneous evidence of their decision making and the actual use of funds. The property owners thus fell short of their burden to show that the Commissioners abused their discretion under the statute. *See Painter*, 288 N.C. at 178.

Finally, the Commissioners did not abuse their discretion by failing to make simultaneous, on-the-record findings regarding how each expenditure would attract tourists. The plain statutory language imposes no formal findings requirement. Although such record-keeping may be prudent, the evidence adduced during discovery is sufficient to show that the Commissioners exercised reasoned and good faith judgment in determining that adequate public safety spending would help attract tourists to the area.

### III.   Conclusion

The County did not abuse its discretion, act in an arbitrary or capricious manner, or disregard the law by concluding that increased spending on public safety

services impacted by heavy area tourism qualifies as tourism-related expenditures. The trial court properly entered summary judgment for the County on this claim, and the Court of Appeals erred when it reversed. We reverse the decision of the Court of Appeals and remand this matter for further remand to the trial court to enter summary judgment for the County on the property owners' second claim and for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

Justice BARRINGER concurring.

I concur with the majority's determination that Currituck County officials have the discretion to appropriate occupancy tax revenue to spend on public safety services. However, I write separately to express my concern at the lack of record evidence demonstrating that this discretion is actually being exercised.

The local act gives the Currituck County Board of Commissioners (Commissioners) the exclusive authority to make a "judgment" on whether a certain manner of spending will "attract[ ] tourists or business travelers to the county." An Act to Allow an Increase in the Currituck County Occupancy Tax and to Change the Purposes for Which the Tax May Be Used, S.L. 2004-95, § 2, 2003 N.C. Sess. Laws (Reg. Sess. 2004) 115, 116. Thus, if the Commissioners determine that appropriating occupancy tax revenue to public safety services will attract visitors, this determination will be upheld unless it is so unreasoned as to constitute an abuse of discretion. *See Little v. Penn Ventilator Co.*, 317 N.C. 206, 218 (1986) ("The abuse of discretion standard of review is applied to those decisions which necessarily require the exercise of judgment.").

Before this Court, plaintiffs allege that, prior to the filing of their lawsuit, the county appropriated occupancy tax revenue without even a cursory discussion of whether the appropriation was tourism-related. Instead, plaintiffs claim that the occupancy tax revenue was routinely dumped directly into the county's general fund,

rendering those funds practically untraceable. Disturbingly, defendants did not even attempt to refute this accusation. This lack of transparency in government is extremely troubling.

Although the Commissioners have the power to exercise judgment as to whether an appropriation is tourism-related, they are required to actually *exercise* this judgment. *See State v. Ashe*, 314 N.C. 28, 34 (1985) (stating that when a statute gives a decisionmaker "discretion" to make a decision, that decisionmaker "must exercise its discretion"). Best practice would be for the Commissioners to appropriate the occupancy tax revenue to identifiable, discrete projects *only after* making clear findings that they believed those projects were tourism-related. To do any less is to invite legal challenges from a citizenry rightfully dismayed by its government operating in the shadows.

Transparency in government is critical. Democratic institutions are undermined "when the transactions of . . . rulers may be concealed."[1] It is "a fair presumption that secrecy means impropriety." Woodrow Wilson, *The New Freedom: A Call for the Emancipation of the Generous Energies of a People* 114 (1913).

I share in plaintiffs' exasperation at the lack of transparency exhibited here. Citizens and taxpayers deserve better. *See Philip Morris USA, Inc. v. N.C. Dep't of Revenue*, 386 N.C. 748, 764 (2024).

---

[1] Patrick Henry, Speech on the Federal Constitution at the Virginia Ratifying Convention (Monday, 9 June 1788), *in 3 The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 179 (Washington, Jonathan Elliot ed., 2nd ed. 1836).